378 So.2d 11 (1979)
Beverly A. SMITH, Appellant,
v.
Donald N. SMITH, Appellee.
No. 79-546.
District Court of Appeal of Florida, Third District.
November 20, 1979.
Rehearing Denied January 18, 1980.
*12 Sams, Gerstein & Ward and Richard E. Gerstein, Miami, Roger A. Bridges, Coral Gables, for appellant.
Horton, Perse & Ginsberg and Mallory H. Horton, Miami, for appellee.
Before HAVERFIELD, C.J., SCHWARTZ, J., and MELVIN, WOODROW M. (Ret.), Associate Judge.
SCHWARTZ, Judge.
After a 17-year marriage to the president of Burger King which produced three children and which became irretrievably broken because of the husband's involvement with another woman, the appellant Beverly Smith was awarded four years of rehabilitative alimony and required to leave the jointly-held marital home within three months of the dissolution; during that time she was to bear the entire burden of the mortgage and expenses. We reverse these provisions of the final judgment as unsupported by the evidence and the applicable law, and order that the alimony be made permanent and that the wife be granted the right to live in the home until the youngest child reaches 18, with the husband required to bear his half of the necessary charges upon it. We also reverse a portion of the final judgment awarding the husband the entire interest in certain shares of stock which had been held in the names of both parties and which had been purchased by funds not "unconnected with the marital relationship." The other provisions of the final judgment challenged by the wife, including the amounts of alimony and child support, are affirmed.
Donald and Beverly Smith were married in Canada in 1961. He was 21 and attending college in Montana. She was a 19 year old high school graduate with business school training who was employed as a secretary and bookkeeper. She continued to work in that capacity until shortly before she gave birth to the couple's first child, Jeffrey, who is now 13. Mrs. Smith has not been employed since[1] and has devoted herself *13 instead to being a housewife and raising Jeffrey and the Smiths' other two children, Stacy, now 11, and Darby, who is 7. Mr. Smith, on the other hand, went into the fast food business and prospered. A few years after the marriage, he was hired by MacDonalds Corporation. By 1975, he had risen to become the executive vice president of that company. He was then based in Chicago, where he lived with his wife and children in a lavish twelve room lakeside home.
Early in 1976, Mr. Smith started the process which, as was indisputably established below, led to the breakup of the marriage. He looked up and tracked down his high school girlfriend, a Ms. Brogan, and began a relationship with her which has continued to the present day. In July, 1976, he told his wife he wanted nothing further to do with her and left the family home to live with his girlfriend. Mrs. Smith, who was not then aware of the affair, thereupon sued for divorce in Illinois. While the parties were separated, however, Mr. Smith was offered the presidency of the Burger King Corporation in Miami and decided to attempt a reconciliation. Around Christmas, 1976, he was taken back into the home.
At the beginning of 1977, Smith, having accepted the Burger King position, moved his family to Miami. He remained interested in Ms. Brogan, however, and after a series of arguments on the subject with his wife, he left his home permanently  again, to move in with Ms. Brogan  in August, 1977. In September, he filed a petition for dissolution in the Dade County Circuit Court, which was met by Mrs. Smith's counterpetition. From the outset, only money has been in dispute. Both parties sought a dissolution, and Mr. Smith has never challenged Mrs. Smith's fitness nor otherwise resisted her request for custody of the children.
The trial testimony demonstrated that Smith commands a salary fully commensurate with his position as the head of one of the nation's most prominent corporations. His gross employment income exceeds $225,000 and his net after taxes is over $150,000 per year. Consistent with that income, he established a life style for his wife and children which, while perhaps not mind-boggling,[2] was at least eye-opening. After selling their equity in the Chicago house for $115,000 cash, the Smiths bought, by the entireties, a Miami home for a purchase price of $339,000. The house, which is encumbered by a $200,000 mortgage with monthly payments of approximately $1,800, was evaluated in 1978 at $380,000. It has several bedrooms, a swimming pool, a tennis court, and furnishings worth some $65,000. The children all attend a private school near the home. After they started school in 1977, Mr. Smith allotted $4,800 per month to his wife in order to run the household. In addition, she was granted the use of the usual array of credit cards and charge accounts at local stores.
During the course of the marriage, the founder of the company made gifts of 1350 shares of MacDonalds stock each, to Mr. and Mrs. Smith individually. With the exception of a 1974 automobile, these shares were the only asset she held in her own name. Mr. Smith, however, had individually purchased an interest, worth a substantial sum, in a limited partnership which owns real property in New Jersey. In addition, the parties purchased, as tenants by the entireties, a $45,000 condominium apartment in St. Petersburg, which is occupied by Mr. Smith's parents in return for a monthly payment representing one-third of its fair rental value. The final asset in question in the proceedings below was 50% of the stock in the corporation which owns the Yellowstone Racquet Club in Montana, which was purchased in April 1975,[3] and was issued to Mr. and Mrs. Smith in both their names. Mrs. Smith had pledged her *14 MacDonalds stock as security for one of the loans which was used to pay the purchase price, and both the down payment and amounts due on the loans were paid by Smith from assets he had earned during the marriage.
Because the wife's objection to evidence of marital misconduct by either party as irrelevant was overruled,[4] the record contains extensive evidence of Smith's affair with Brogan and the direct causal relationship it bore to the termination of the marriage. For the same reason, it also establishes, by her own admission, that Mrs. Smith had sexual relations with others after her husband had already permanently left the Miami home and at a time when, as he himself stated at the trial, he did not care what she did with other men. There was also testimony, denied by Mrs. Smith, that she had admitted a single adulterous incident which occurred while she was still living with her husband. The final judgment, which stated only that there was "evidence" as to the pre-separation incident, did not resolve this conflict, but there is, in any event, no indication whatever that any misconduct of the wife had the slightest effect on the marital relationship or the fact that it had come to an end.
In the final judgment now under review, the lower court, after dissolving the marriage and granting the children's custody to the wife, and after pointedly noting that both parties "have been guilty of adulterious [sic] relationships,"
(a) denied the wife's claim for permanent alimony and awarded $2,000 per month in rehabilitative alimony for four years
(b) granted child support of $75.00 per week per child plus medical expenses and the maintenance of the husband's existing life insurance policies with the children as beneficiaries
(c) provided that
The Husband's claim of a special equity in the marital home and the Wife's claim for Lump Sum Alimony of the marital home or a special equity therein are both denied and the Petitioner/Husband and Respondent/Wife, upon the signing of this Order, shall own the said marital home and the furnishings therein as tenants in common.
* * * * * *
The Wife shall have possession of the marital home for a period of three months should she desire,[5] however, the Wife shall pay for the maintenance and mortgage on the house for its use during the time she possesses the home. The purpose of this is for the parties to have time in which to make arrangements for the disposal of the marital home and the furnishings therein.
(d) declared the husband the owner of all the Yellowstone Racquet Club stock, thereby effectively striking the wife's interest in the 50% certificate, on the stated ground that it "was never intended to give the Wife any right, title or interest in the . .. Club."
The wife has challenged these portions of the final judgment.[6] As already indicated, we affirm in part and reverse in part.
In his appellate presentation in support of the manner in which the trial court dealt with the wife, the husband points, as did the final judgment itself, to the fact of the wife's adulterous behavior and suggests that this evidence at least partially justifies the result. For two separate reasons, we hold directly to the contrary.
In the first place, as has been demonstrated, the wife's conduct simply had nothing whatever to do with any of the issues properly considered in this case. It *15 was unrelated either to the breakup of the marriage, or to any of the financial relationships and obligations between the parties with which this dissolution proceeding, in common with most, was really concerned. Of course, under the specific provisions of Section 61.08 Fla. Stat. (1975), the court "may consider evidence of [the] adultery" of a spouse seeking alimony or indeed "any factor necessary to do equity ... between the parties." See Williamson v. Williamson, 367 So.2d 1016 (Fla. 1979). But such conduct may not be ipso facto employed as an excuse or device to reduce an otherwise appropriate award when, as here, it clearly appears that it was legally and equitably irrelevant. In several situations, considerations of adultery or other misconduct  of, in a word, "fault"  are obviously pertinent to the determination of the amount of or the entitlement to an alimony award. The Williamson case, in which the dissolution resulted in an economic hardship caused by the almost universal fact that there were insufficient resources to support two separate households and in which the responsibility for this condition should therefore be ascertained, provides one such example. Even when there is no financial problem, it might well be thought improper to permit an errant spouse to destroy a marriage and then to claim benefits equal to those which would have been provided had it remained intact. See Martin v. Martin, 366 So.2d 475 (Fla. 3d DCA 1979); Oliver v. Oliver, 285 So.2d 638 (Fla. 4th DCA 1973); Beard v. Beard, 262 So.2d 269 (Fla. 1st DCA 1972). But, again, neither of these situations  nor any equivalent one  was shown to exist in this case. Thus we adopt and apply the suggestion in the specially concurring opinion of the present writer in Martin v. Martin, supra, at 366 So.2d 476, that
[E]vidence [of adultery may not] be employed merely to decrease or enhance an award by way of punishment for conduct of which the court may disapprove, when that conduct is not related to the equitable considerations with which dissolution courts should be concerned under our no-fault law. McAllister v. McAllister, 345 So.2d 352, 354-355 (Fla. 4th DCA 1977), cert. denied, 357 So.2d 186 (Fla. 1978).
It seems clear that the adoption of a contrary view would make a mockery of Florida's no-fault dissolution concept. Perhaps just as importantly, it would render all alimony decisions in such situations essentially unreviewable; any conclusion by a trial court, either to "punish" or not to punish a spouse for adultery based simply upon its own individual views, would be inviolate.[7] In this system of laws and not men, such a situation cannot be permitted.[8]
The second reason for rejecting the husband's contention on this point is that, even if Mrs. Smith's adultery, standing alone, could properly have been considered, Mr. Smith's admitted conduct renders it utterly inequitable for it to have resulted in any diminishment of his obligations to her. As the court said in Williamson, supra, at 367 So.2d 1018:
... it would be manifestly unfair for one spouse to be allowed to defend against an alimony claim by charging the other spouse with adultery when the spouse not seeking alimony may be equally guilty of the same misconduct.
Here, where the husband's adultery was responsible for the dissolution, and the wife's immaterial, the unacceptability of such a result becomes all the more obvious.
Since the adultery "issue" therefore may not be considered, there remains no basis for the trial judge's denial of permanent alimony. At the time of the dissolution, Mrs. Smith was 36 years of age and was given custody of the three children of the marriage, ages 13, 11 and 7. She had *16 no special education or employment experience and had last worked 14 years earlier in a job for which she is now disabled.[9] There is thus in essence, no remunerative employment to which she can return. There is likewise nothing to suggest that, at the end of the four-year "rehabilititive" period  which is supported in the transcript only by the scarcely surprising fact that it takes that long to receive a college degree  she will be in any better position to support herself than she is presently.[10] This is even more clearly the case in the light of the showing that Mrs. Smith wishes, during that four year period and afterwards, to continue the important work of raising her children in which she and her then-husband agreed she should be engaged. The passage of four years, when the children will be 17, 15 and 11, will not materially change her situation with respect to the discharge of this obligation. And when the youngest child reaches 18, and Mrs. Smith is 48, her employment prospects might be even dimmer than they are now.
Under this set of circumstances, involving a lengthy marriage, minor children, a wife with the stated wish to continue rearing them and with no otherwise marketable skills, and a husband with a demonstrated ability to pay, the trial judge committed an error of law in granting rehabilitative rather than permanent alimony. Of the numerous cases of this and other courts which mandate this conclusion, we quote from only two. In Schwartz v. Schwartz, 297 So. 117 (Fla. 3d DCA 1974), the facts as to the length of the marriage, and the age and employment experience of the wife and the number of children were uncannily similar to those here. At 297 So.2d 119, the court stated:
When the parties were married in 1957, the appellant was 19 years of age, and she was 36 years old at the time of the judgment. Her schooling was not extensive. She is not equipped by training, experience or otherwise to support herself. Her only employment consisted of approximately two weeks as a receptionist in a doctor's office, sometime prior to her marriage. Therefore, there is nothing to which the wife can be rehabilitated... .
On authority of the decision of this court in Reback v. Reback, Fla.App. 1974, 296 So.2d 541 and Schwartz v. Schwartz, Fla.App. 1972, 259 So.2d 745, we hold that the circumstances relating to the appellant-wife, as disclosed in the record, did not furnish proper basis for the alimony awarded to her to be `rehabilitative', and to terminate at the end of the stated period.
As we similarly said in McNaughton v. McNaughton, 332 So.2d 673, 675 (Fla. 3d DCA 1976), cert. denied, 345 So.2d 424 (Fla. 1977):
We hold that the trial judge erred in determining that the facts of this case called for rehabilitative alimony. See Reback v. Reback, Fla.App. 1974, 296 So.2d 541; and Schwartz v. Schwartz, Fla.App. 1974, 297 So.2d 117. This 43 year old mother has no income or training. She ought not be required to leave the home and the children in order to gain the means of support when the husband is well able to support his wife and children during the minority of the children. The wife will be 54 years old when the youngest child reaches 18. For the court to determine at this time that the wife can enter the labor market and support herself at that time is a prediction that need not be made at this time because the court may adjust alimony to changed conditions upon a proper petition. During the marriage, the husband maintained a good home and approved of the role of the wife. There is no reason that the *17 dissolution should disrupt the home for the children so long as the husband is well able to maintain them in that home. We therefore, hold that error has been demonstrated on this point.
See also Ciraco v. Ciraco, 363 So.2d 53 (Fla. 3d DCA 1978), and cases cited; McCloskey v. McCloskey, 359 So.2d 494 (Fla. 4th DCA 1978); Bowen v. Bowen, 347 So.2d 675 (Fla. 3d DCA 1977); West v. West, 345 So.2d 756 (Fla. 4th DCA 1977); McAllister v. McAllister, 345 So.2d 352 (Fla. 4th DCA 1977), cert. denied, 357 So.2d 186 (Fla. 1978); Blass v. Blass, 316 So.2d 308 (Fla. 3d DCA 1975); King v. King, 316 So.2d 322 (Fla. 4th DCA 1975); Yohem v. Yohem, 324 So.2d 160 (Fla. 4th DCA 1975); Lash v. Lash, 307 So.2d 241 (Fla. 2d DCA 1975); cf. Kvittem v. Kvittem, 365 So.2d 791 (Fla. 4th DCA 1978). For these reasons, that portion of the final judgment granting rehabilitative alimony is reversed, with directions that on remand the $2,000 monthly award be made permanent.[11]
Although Mrs. Smith contends that the $2,000 per month granted her was inadequate, we do not find  particularly in view of our conclusions, which are discussed infra, as to Mr. Smith's continuing financial obligations with respect to the marital home  that the amount awarded represents an abuse of discretion. We reach the same conclusion in rejecting the appellant's attack on the provisions made for child support. Herzog v. Herzog, 346 So.2d 56 (Fla. 1977); Shaw v. Shaw, 334 So.2d 13 (Fla. 1976).
We do find error, however, in those portions of the judgment which in effect[12] granted the wife and children only three months after the dissolution in which to reside in the home, and required Mrs. Smith to bear its entire expense during that period. The house in question was chosen by both parties as an appropriate residence for the family. It is no more expensive or well-appointed than was and is justified by their financial circumstances. It is close to the school which both Mr. and Mrs. Smith agree the children should attend. We think, therefore, that there is no basis for declining to grant the wife the right to occupy the residence with the children until she remarries or the youngest attains majority. As was stated in Bailey v. Bailey, 361 So.2d 204, 205 (Fla. 1st DCA 1978):
We do find merit, however, in the point raised by husband on cross-appeal. He contends that the trial court erred in limiting his use and possession of the marital home to a period of approximately one year. We agree that he as the custodial parent should have the use and possession of the home until the child's majority or his remarriage. See McNaughton v. McNaughton, 332 So.2d 673 (Fla. 3d DCA 1976).
Accord, e.g., Alford v. Alford, 364 So.2d 1255 (Fla. 2d DCA 1978); Singer v. Singer, 342 So.2d 861 (Fla. 1st DCA 1977); McNaughton v. McNaughton, supra; Plant v. Plant, 320 So.2d 455 (Fla. 3d DCA 1975), cert. denied, 336 So.2d 107 (Fla. 1977); Reisman v. Reisman, 314 So.2d 783 (Fla. 3d DCA 1975), cert. denied, 336 So.2d 107 (Fla. 1976); Venzer v. Venzer, 308 So.2d 544 (Fla. 3d DCA 1975).
During this period of the wife's occupancy of the home, she need not pay any more than the charges applicable to her half-interest in the residence which the parties now own in common. The mortgage payment on the house is $1,800 per month which would almost entirely dissipate the wife's $2,000 in monthly alimony. There is no justification for the requirement in the final judgment that she employ $900.00 of this sum in order to contribute to Mr. Smith's interest in the property. On this *18 point, the following language in Waskin v. Waskin, 346 So.2d 1060, 1063 (Fla. 3d DCA 1977) is controlling:
The mortgage payment was $311 per month in 1975 (the amount has increased each year). The wife's alimony payment is $150 a week or approximately $650 a month, so that nearly one-half of her alimony is required to provide a place to live for herself and the children. Because the property is jointly owned, the judgment would require her to build her husband's equity in the property. As we noted in Hendricks v. Hendricks, 312 So.2d 792 (Fla. 3d DCA 1975), it is the obligation of each tenant in common to pay one-half of the property expenses consisting of mortgage payments, insurance, taxes and necessary repairs. The failure of the court to require Dr. Waskin to pay one-half of the charges on the former marital residence was clear error. See Singer v. Singer, 342 So.2d 861 (Fla. 1st DCA 1977). See also Maroun v. Maroun, 277 So.2d 572 (Fla. 3d DCA 1973); Mintz v. Ellison, 233 So.2d 156 (Fla. 3d DCA 1970); and Spencer v. Spencer, 160 Fla. 749, 36 So.2d 424 (1948). [e.s.]
Accord, e.g., Rubino v. Rubino, 372 So.2d 539 (Fla. 1st DCA 1979); Singer v. Singer, supra. Hence, on remand, the husband shall be required to pay one-half of the mortgage payments, insurance, taxes and necessary repairs to the home during Mrs. Smith's use of the residence as required by our earlier holding. The amended judgment should also include a provision that, upon the sale of the residence, Mrs. Smith shall be credited with such payments attributable to the husband's interest as she made in compliance with the terms of the final judgment which we have now reversed. Cf. Waskin v. Waskin, supra, at 346 So.2d 1064.
Finally, we reverse the determination that Mrs. Smith has no interest in the certificate to 50% of the shares in the Yellowstone Club, which was titled in the names of both parties. Quite apart from the fact that her individually-owned MacDonalds' stock was used as collateral, it is undisputed that all of the consideration for the shares came from funds which the husband had earned and accumulated during the marriage. There was therefore no ground to award Mr. Smith his wife's interest as established by the record title existing in both their names. Under Ball v. Ball, 335 So.2d 5, 7 (Fla. 1976), a spouse may establish a special equity in property titled in the other's name by establishing, for example, that
"all of the consideration for property held as tenants by the entireties was supplied by one spouse from a source clearly unconnected with the marital relationship."
The Ball decision goes on to say, however, at note 7, that
"Ordinarily a special equity will not arise where property held as tenants by the entireties is acquired with the funds generated by one working spouse, while the other spouse performs normal household and child-rearing responsibilities."
There is no basis in the record for departing from this rule in the case before us. See also, e.g., Fiedler v. Fiedler, 375 So.2d 1119 (Fla. 2d DCA 1979). On remand, therefore, Mrs. Smith shall be declared the owner of 25% of the shares of the Racquet Club corporation.
The judgment below is affirmed in part and reversed in part and the cause remanded with directions to enter a revised final judgment in accordance with the views expressed in this opinion.
Affirmed in part, reversed in part and remanded.
HAVERFIELD, C.J., concurs in conclusion.
NOTES
[1] Because Mrs. Smith lost a finger in a lawn mower accident during her first pregnancy, it would be difficult, at best, for her to return to a secretarial position.
[2] See Storer v. Storer, 353 So.2d 152 (Fla. 3d DCA 1977), cert. denied, 360 So.2d 1250 (Fla. 1978); McCloskey v. McCloskey, 359 So.2d 494 (Fla. 4th DCA 1978), cert. denied, 368 So.2d 1370 (Fla. 1979).
[3] In 1976, Smith purchased the other 50% of the stock in his own name.
[4] But see McCloskey v. McCloskey, supra, note 2, at 359 So.2d 496.
[5] Acting on an emergency application, this court stayed this provision of the judgment, thus permitting the wife and children to remain in the home pending the appeal.
[6] The judgment also denied the husband's claim for a special equity in the St. Petersburg condominium and found that the wife had no interest in the New Jersey partnership. There is no issue raised here as to either of these rulings.
[7] The importance of the "luck of the draw," referred to in McAllister v. McAllister, 345 So.2d 352, 354 (Fla. 4th DCA 1977), cert. denied, 357 So.2d 186 (Fla. 1978), which should be reduced as much as possible, would instead be immeasurably increased.
[8] It is to be hoped, also, that this holding may eliminate much of the self-righteous posturing and finger-pointing which still pervades many dissolution proceedings, notwithstanding the supposed demise of the fault system of resolving domestic disputes.
[9] See note 1, supra.
[10] The record shows that Ms. Brogan, who is in her 30's, is healthy, and has a Ph.D. which was partially financed by Mr. Smith, does not work and is fully supported by him in a $95,000 condominium apartment where they live together. The irony that this arrangement is terminable only by the will of the parties, but that Smith's obligation to support his ex-wife would end after four years by order of the lower court, does not escape us.
[11] It is perhaps superfluous to add that this "permanent" alimony is subject to modification upon a proper showing, under § 61.14, F.S. (1975) of a change in the wife's circumstances, one of which may well be any increase in her employment opportunities when the youngest child leaves the home.
[12] There were no pleadings which sought a partition of the property and no formal order requiring it. Thus, the three-month provision amounts to no more than an indication of the contents of a possible further order concerning the disposition of the house.