TAYLOR, J.
The husband, Michael Weymouth, appeals a final judgment of dissolution and a final fee award. The wife, Veronica Wey-mouth, cross-appeals the final judgment of dissolution. We affirm in part, reverse in part, and remand for further proceedings.
I. Factual Background
The parties were married in 1993. Shortly before their marriage, the parties executed an Antenuptial Agreement prepared by the husband’s attorney. The Antenuptial Agreement contained a schedule of all the husband’s assets and liabilities prior to the execution of the agreement. Paragraph 3 of the Antenuptial Agreement provided that the wife would “hereby forever remise, release and quit claim all right, title and interest she might have or otherwise could have ... to any property owned prior to marriage ... by Michael and specifically waives any and all claim or claims which she might have in and to the real and personal property of Michael, owned prior to marriage.... ” Paragraph 4 provided that all “property acquired by either of them during the marriage (other than property acquired by either of them by gift or inheritance)” is marital property. The Antenuptial Agreement did not, however, contain an express waiver of growth or appreciation of premarital or non-marital assets.
Paragraph 11 of the Antenuptial Agreement provided that the parties “specifically waive any claims against the other for alimony ... unless the basis for the dissolution is adultery, physical abuse, mental or emotional abuse.” Furthermore, “[i]n the event of adultery, physical abuse, or mental or emotional abuse, either party shall be able to seek alimony and support from the other pursuant to Florida law; except that adultery or abuse may not be used against the party obligated to pay alimony or support.”
Before the marriage, the husband owned a Broward County house, which later became the marital residence. On the date the parties entered into the marriage, the fair market value of the home was $250,000, and the home was encumbered by a $160,000 mortgage. Between 1993 and 2006, the parties lived in the Broward County house, but the home remained titled in the husband’s name alone. Marital earnings were used to pay the house mortgage, insurances, real estate taxes and maintenance. In addition, substantial im *33 provements were made to the property during the marriage.
In 2003, the parties went to a marital counselor because of problems in the marriage. Nonetheless, the parties remained together at that time, and in the early summer of 2006, they began discussing a move to North Carolina. The husband testified that he was unhappy in the marriage and hoped that the move might resurrect the parties’ relationship.
Around the same time in 2006, the husband was terminated from his position at Hamway Flooring, and he returned to work for Hunter Crow Corporation, a general contracting firm that the Weymouths founded in 1997. The husband claimed that his income at Hunter Crow was significantly less than it was at Hamway.
In September 2006, the parties acquired a North Carolina home. The parties planned to move there at the end of their sons’ school year in May or June 2007. They planned to rent the Broward County house for a year and then sell it to pay for the North Carolina property if the move worked out.
Beginning in March 2007, the husband began having frequent contact, via phone calls and text messages, with a woman who was not his wife. Additionally, beginning in April 2007, the husband would sometimes leave the house after dinner and come home very late. By May 2007, the wife was aware of problems with the marriage. The husband told her that he no longer wanted to move to North Carolina. The wife asked him if there was another woman involved in his decision. The husband denied that there was and became upset at the wife for asking.
The parties’ relationship continued to get worse during the summer of 2007. In August 2007, the husband moved out of the house. In September 2007, the husband traveled to the Florida Keys with the “other woman.” Both the husband and the “other woman” testified that the September 2007 trip was the first time they had sexual relations with each other. The trial court, however, specifically found that their testimony on this point was not credible.
By October 2007, the wife was aware of the relationship with the mistress. Even so, the wife was willing to work on the marriage. But when she learned that the husband was planning another trip with the “other woman,” the wife decided to file for divorce. Although the husband pleaded with the wife to wait, the wife filed for divorce in November 2007.
During trial, the wife submitted evidence of her need based on her requested relocation to North Carolina. Furthermore, the wife’s forensic accountant testified regarding the husband’s income and assets.
At the conclusion of the trial, the court ordered the parties to submit written closing arguments and proposed final judgments. On the alimony issue, the husband’s Closing Argument argued: (1) the Antenuptial precluded an alimony award; (2) the wife had not met her relocation burden; and (3) the wife should be awarded only $1,300 monthly, but at the most, her needs were $2,600 per month.
At a post-trial conference, the trial court advised the attorneys that it was having trouble determining the amount of alimony, explaining that there was no evidence of mortgage expenses for the wife if she moved from the marital residence and secured comparable housing in South Florida. After the hearing, the wife submitted a Motion to Reopen to Permit Additional Evidence, arguing that she should be allowed to submit evidence of her expenses if she remained in Broward County instead of relocating to North Carolina. The mo *34 tion attached a letter which set forth what the cost of purchasing a $500,000 house in Broward County would be for the wife. The husband filed an objection to the wife’s motion to reopen the evidence, arguing that she had the opportunity at trial to present evidence of her need if her request for relocation were denied, and that her failure to do so constituted a waiver.
The court never explicitly ruled on the wife’s motion to re-open. Instead, in October 2009, the trial court entered a Final Judgment of Dissolution, which prompted both parties to file motions for rehearing.
The trial court later entered an Amended Final Judgment of Dissolution, which ruled: 1) the wife’s request for relocation was denied; 2) the parties would have shared parental responsibility; 3) the Antenuptial was unambiguous; 4) the basis for the dissolution was adultery; 5) the husband’s income was $290,000 per year, based on his average income of $270,000 from 2007 and 2008 plus the $20,000 he regularly receives as a gift from his mother each year; 6) the wife’s income was $86,000; 7) the wife was entitled to permanent periodic alimony of $3,000 monthly to begin after the sale of the North Carolina property; 8) the wife was awarded the Broward County house, and the non-marital portion was only the $90,000 in equity that existed at the inception of the marriage; 9) the parties were each awarded 50% of the sales proceeds of the North Carolina property; 10) the husband had a monthly child support obligation of $2,211.32; and 11) the wife was entitled to fees and costs, with jurisdiction reserved as to the amount.
Attached to the Amended Final Judgment were the equitable distribution schedule and child support worksheet first submitted to the court in the wife’s August 2009 post-trial letter. Despite the fact that the amended final judgment reflected that the parties would each receive 50% of the proceeds of the sale of the North Carolina property, the equitable distribution schedule attached to the Amended Final Judgment awards the entire North Carolina property (worth $1,457,000 per the schedule) and its mortgage liability (worth $960,000 per the schedule) to the husband. This resulted in the husband owing the wife a $290,940 equalizing distribution.
On June 23, 2010, the trial court entered an Amended Fee Judgment, awarding the wife fees for her counsel and expert in exactly the amount requested, plus interest.
The husband appeals, and the wife cross-appeals.
II. Equitable Distribution

A. The Broward County House

The Broward County house was the husband’s non-marital asset before the marriage; at the time the parties got married in 1993, the house was worth $250,000 and was subject to a $160,000 mortgage.
The preliminary issue is whether the wife waived the right to any passive appreciation of the value of the Broward County house in the prenuptial agreement. Where a prenuptial agreement does not address the right to enhanced value of a non-marital asset, that value is subject to equitable distribution. See, e.g., Valdes v. Valdes, 894 So.2d 264, 267 (Fla. 3d DCA 2004). Here, when the wife entered into the prenuptial agreement in this case, she agreed to “remise, release and quit claim all right, title and interest she might have or otherwise could have ... to any property owned prior to marriage ... by Michael and specifically waives any and all claim or claims which she might have in and to the real and personal property of Michael, owned prior to marriage.... ” However, *35 as in Valdes, the prenuptial agreement in this case does not specifically address enhancement value.
The reference to “quit claim” in the prenuptial agreement does not mean that the agreement governed enhancement value. The husband relies upon Ledea-Genaro v. Genaro, 963 So.2d 749 (Fla. 4th DCA 2007), in support of his argument that the wife waived even passive appreciation of the property, but the husband’s reliance is misplaced. In Ledea-Genaro, the wife entered into a prenuptial agreement which provided: “In the event of a divorce initiated by either party, [the wife] shall vacate the marital home and deliver a Quitclaim Deed to the subject property to [the husband] in exchange for a complete, absolute release” of any obligation under the parties’ mortgage. Id. at 751. We held that the prenuptial agreement “unambiguously required that the wife quitclaim her entire interest in the home to the husband in the event that a petition for dissolution was filed .... ” Id. at 752 (emphasis added). In other words, we interpreted the agreement in Ledea-Genaro as meaning that the wife in that case would convey her entire interest in the marital home at the time of the divorce, and thus the wife waived her right to any share of equity in the home that had accrued during the course of the marriage.
Here, by contrast, the boilerplate reference to a “quit claim” in the prenuptial agreement referred to the wife’s waiving her interest in the property at the time the agreement was entered into. The prenuptial agreement in this case did not require the wife to convey her interest in the Broward home to the husband at the time when any “petition for dissolution was filed.” Therefore, Valdes controls, rather than Ledea-Genaro.
Although the trial court was correct in determining that the passive appreciation of the Broward County home was marital property subject to equitable distribution, the trial court’s methodology for distributing this asset was error. In Kaaa v. Kaaa, 58 So.3d 867, 868 (Fla.2010), the Florida Supreme Court held that, contingent upon certain findings of fact by the trial court, “passive appreciation of the marital home that accrues during the marriage is subject to equitable distribution even though the home itself is a nonmari-tal asset.”
The Florida Supreme Court explained that the trial court should employ the following method when determining whether a non-owner spouse is entitled to a share of the passive appreciation of the non-marital property: (1) the trial court must determine the overall current fair market value of the property; (2) the trial court must determine whether there has been a passive appreciation in the property’s value; (3) the trial court must determine whether the passive appreciation is a marital asset, a step which includes making findings of fact as to whether marital funds were used to pay the mortgage, whether the non-owner spouse made contributions to the property, and the extent to which the contributions of the non-owner spouse affected the appreciation of the property; (4) the trial court must determine the value of the passive appreciation that accrued during the marriage and is subject to equitable distribution; and (5) after the court determines the value of the passive appreciation to be equitably distributed, the court’s next step is to determine how the value is allocated. Id. at 872. “In general, in the absence of improvements, the portion of the appreciated value of a separate asset which should be treated as a marital asset will be the same as the fraction calculated by dividing the indebtedness with which the asset was encumbered at the time of the marriage by *36 the value of the asset at the time of the marriage.” Id. (quoting Stevens v. Stevens, 651 So.2d 1306, 1307-08 (Fla. 1st DCA 1995)) (emphasis in Kaaa).
As a preliminary matter, the trial court erred in awarding the Broward County house to the wife because the home itself was a non-marital asset belonging to the husband. Only the passive appreciation of the home, not the home itself, was subject to equitable distribution. Second, the trial court erred in determining that the only non-marital portion of the house value was the $90,000 in equity that existed at the time of the parties’ marriage in 1993. This is not the proper methodology for calculating the non-marital portion of the value of the property. While the trial court’s findings — including payment of the mortgage with marital funds and improvements to the property during the marriage — do support that the wife is entitled to a share of the passive appreciation of the Broward County home, the case should be remanded for the trial court to conduct further proceedings consistent with the methodology set forth in Kaaa.

B. North Carolina Property

The Amended Final Judgment found that each party had a 50% interest in the North Carolina Property and ordered that the proceeds of the sale would be divided equally between the parties. In contrast, the Equitable Distribution Schedule attached as an exhibit to the Amended Final Judgment assigns the property and its debt entirely to* the husband. This aspect of the judgment is internally inconsistent. A dissolution judgment that is internally inconsistent should be reversed and remanded for correction or clarification. See, e.g., Woellmer v. Woellmer, 935 So.2d 610, 611 (Fla. 4th DCA 2006). On remand, the trial court should utilize an equitable distribution schedule that reflects the court’s ruling that the parties would equally split the proceeds of the sale of the North Carolina property.

C. BOA Accounts

Additional facts are relevant to this sub-issue. The equitable distribution schedule attached to the final judgment shows $244,886 in Bank of America Accounts and CDs awarded to the husband. The amounts were taken from the wife’s expert’s schedules, which used valuation dates between September 2007 and October 2008. As of June 2009, however, the husband’s amended financial affidavit showed that the Bank of America accounts and CDs totaled only $37,490.59. The husband testified that the difference went to pay marital expenses.
We have stated that “it is error to include in the equitable distribution scheme assets or sums that have been diminished or depleted during the dissolution proceedings unless the depletion was the result of misconduct.” Tillman v. Altunay, 44 So.3d 1201, 1203 (Fla. 4th DCA 2010) (internal quotation marks and citation omitted). To include a dissipated asset in the equitable distribution scheme, there must be evidence of the spending spouse’s intentional dissipation or destruction of the asset, and the trial court must make a specific finding that the dissipation resulted from intentional misconduct. Roth v. Roth, 973 So.2d 580, 585 (Fla. 2d DCA 2008).
Here, there was no evidence as to any misconduct connected to the depletion of the Bank of America accounts, and the trial court made no such finding. Rather, the uncontradicted testimony was that these assets were liquidated to pay the parties’ personal expenses during the separation. Therefore, the trial court erred in valuing the Bank of America accounts at *37 $244,886, an amount which was largely depleted by the time of trial.

D. Valuation of Hunter Crow

We find that the trial court did not abuse its discretion in its valuation of the Hunter Crow business, including the trial court’s decision to select a post-petition valuation date.

E. Insurance Policy

During trial, the wife’s expert used a cash value of $6,634 to value the New York Life insurance policy. Only in the post-trial schedules did the wife claim for the first time that the policy was worth $12,000, which is the figure that the court accepted. The trial court erred in accepting this post-trial change, which was never explained.
III. Alimony
The husband raises various arguments against the alimony award. First, he claims that the trial court abused its discretion in finding that the “basis of the dissolution is adultery,” thereby permitting the wife to receive alimony under the Antenuptial. Second, he argues that the trial court erred in determining his income. Finally, he asserts that the trial court abused its discretion in allowing post-trial evidence of the wife’s needs.

A. Adultery

The Antenuptial agreement in this case precluded an award of alimony unless the basis for the dissolution was adultery or abuse. “Because adultery usually takes place in secret or seclusion, proof thereof in most instances is by circumstantial evidence, through showing desire, by evidence of mutual affection or otherwise, coupled with opportunity under conditions or circumstances from which a reasonable judge of human nature would be led to conclude that adultery was committed.” Leonard v. Leonard, 259 So.2d 529, 530 (Fla. 3d DCA 1972). Furthermore, circumstantial evidence can overcome a spouse’s denial of ádultery. See id. at 530-31.
Nonetheless, even if adultery occurs, this does not necessarily mean that adultery is the basis for the dissolution. In Smith v. Smith, 378 So.2d 11, 15 (Fla. 3d DCA 1979), the court noted that the ■wife’s alleged post-separation adultery was not related “to the breakup of the marriage, or to any of the financial relationships and obligations between the parties.” Therefore, the wife’s adultery was irrelevant, though the court noted that the husband’s adultery before the breakup was directly responsible for the dissolution of the marriage and was relevant.
Here, the trial court made the specific finding that the basis for the dissolution of marriage was that the husband committed adultery. This finding was supported by competent, substantial evidence. The husband admitted to having sexual relations with his mistress in September 2007, which was after he was separated from his wife but before the filing of the petition for dissolution. However, the communications between the husband and his mistress provided sufficient circumstantial evidence for the trial court to conclude that the husband was engaged in an adulterous relationship even before the separation from his wife. Furthermore, even considering only the post-separation adultery, there was evidence that the wife still wanted to salvage the marriage after the separation, but decided to file for divorce only after she learned that the husband was planning on taking yet another vacation with his mistress, confirming that the mistress was still “in the picture.” We do not disturb the trial court’s finding that adultery was the basis for the dissolution.

*38
B. Income

We acknowledge that it is error to average a spouse’s income over previous years where uncontroverted testimony showed a reduction in income. See Greenberg v. Greenberg, 793 So.2d 52, 55 (Fla. 4th DCA 2001). In this case, however, the testimony was not “uncontrovert-ed” that the husband had a reduction in income. Although the husband testified that his business had experienced a slowdown, the wife’s expert offered testimony to the contrary. On this record, we do not disturb the trial court’s ruling.

C. Post-Trial Evidence of the Wife’s Needs

The husband also complains that the trial court considered post-trial evidence as to the wife’s needs. It is not clear whether the trial court actually considered this evidence, but we need not reach this issue because we find that it is moot. Because we are reversing the trial court’s decision to award the Broward home to the wife, the trial court will need to reconsider the issue of the wife’s needs for purposes of alimony in light of the fact that she will need to secure alternative housing in Bro-ward County. See, e.g., Tilchin v. Tilchin, 51 So.3d 596, 597-98 (Fla. 2d DCA 2011) (where error in equitable distribution cannot be corrected in isolation, remand for reconsideration of equitable distribution plan and alimony award is appropriate). Thus, on remand, the trial court should take additional evidence as to the wife’s needs. The husband will be able to cross-examine the wife’s witnesses and present any evidence on the issue. Accordingly, because this issue needs to be reconsidered by the trial court in the context of an evidentiary hearing, any due process argument that the husband raises in this appeal is moot.

IV. Life Insurance

Section 61.08(3), Florida Statutes (2007), authorizes the trial court to require an obligated spouse to purchase or maintain life insurance “[t]o the extent necessary to protect an award of alimony.” Requiring life insurance to secure an alimony payment “is justified only if there is a demonstrated need to protect the alimony recipient.” Privett v. Privett, 535 So.2d 663, 665 (Fla. 4th DCA 1988). The amount of life insurance required by the trial court must be related to the extent of the obligation being secured. Kotlarz v. Kotlarz, 21 So.3d 892, 893 (Fla. 1st DCA 2009).
We reverse as to the requirement that the husband maintain $1,000,000 in life insurance and remand for the trial court to reconsider the amount. While the husband had historically maintained $1,000,000 of life insurance during the marriage, the $1,000,000 requirement is excessive, given that the child support obligation will expire in 2015 and the alimony obligation can be secured with a lesser amount of insurance. See Walia v. Thomas, 805 So.2d 1041, 1042 (Fla. 4th DCA 2002) (holding that $1,000,000 was substantially more life insurance than necessary to secure the husband’s monthly child support of $2,460 for two children, age nine and sixteen). Furthermore, although the issue was not specifically raised on appeal, on remand the trial court should allocate the amount of life insurance designated to secure the alimony award vis-a-vis the amount designated to secure the child support award. See Gordon v. Gordon, 63 So.3d 824, 827 (Fla. 5th DCA 2011).
V. Attorney’s Fees
Because equitable distribution and alimony will be significantly impacted by this appeal, we reverse and remand so that the trial court can reconsider the award of attorney’s fees once a new final judgment *39 of dissolution is entered on remand. See Tilchin v. Tilchin, 65 So.3d 1207, 1207 (Fla. 2d DCA 2011).

VI. Cross-Appeal

We find no reversible error in the trial court’s determination that the mutual fund accounts at issue in the cross-appeal were non-marital. See Mondello v. Torres, 47 So.3d 389, 393 (Fla. 4th DCA 2010) (“Where the evidence is conflicting as to whether one spouse intends to make a gift to the other, it is the responsibility of the trial court to evaluate the weight and credibility of that testimony and to arrive at a determination.”) (citation and internal quotation omitted).

Affirmed in part, Reversed in part, and Remanded.

POLEN and HAZOURI, JJ., concur.