345 So.2d 352 (1977)
Evelyn M. McALLISTER, Appellant,
v.
John Gordon McALLISTER, Appellee.
No. 75-2018.
District Court of Appeal of Florida, Fourth District.
April 1, 1977.
Rehearing Denied May 23, 1977.
Robert M. Curtis of Saunders, Curtis, Ginestra & Gore, Fort Lauderdale, for appellant.
*353 William E. Blyler of Patterson, Maloney & Shankweiler, Coral Springs, for appellee.
LETTS, Judge.
This appeal stems from a dissolution of marriage in which the wife of a successful doctor received a $500.00 per month award of permanent alimony.
This cause is reversed in part.
The McAllisters were married in 1951 while he was a medical student and she an employed pharmacist. The record reflects that the wife worked, to assist her husband finish school,[1] for over a year after the marriage, and almost immediately thereafter, bore the first of four children. Subsequently, until now, she pursued the outmoded profession of housewife and mother, only once working during a vacation period, in 24 years of marriage. Upon receiving his medical degree, the husband commenced to build a medical practice, equipping his office with the aid of a loan secured by the meager inherited stocks and bonds owned by the wife. His practice became successful and Doctor McAllister's 1973 corporate income tax return, for his single P.A., reflected a gross income of over $200,000. Moreover, his personal return for that same year, even after his accountants had done with their computations, reflected a payment to himself of a $75,000 salary. By contrast, the wife's income from dividends and interest totalled less than $2,200 in that same year.
The record reflects that Doctor McAllister is a good father, 49 years old and a man's man, who goes elk hunting in Wyoming, dove shooting in Mexico, fishing, belongs to the yacht club and enjoys many skiing excursions. Vacations have included several trips to the Bahamas, Canada and to Europe. He breeds horses, co-owns cattle, and he himself claims that his monthly personal living expenses add up to over $2,600. There can be no doubt that he enjoys a style of living and social prestige which, by the rest of society's standards, must be termed both generous and glamorous, and which can continue completely unaffected by the permanent alimony award in the court below. The wife, on the other hand, aged 48, although also able bodied and capable of employment, will, in terms of permanent alimony awarded, be receiving only $500.00 per month, plus her private income of $175.00, for a grand total, before taxes, of $675.00 per month, plus whatever she can earn. She claims her knowledge of pharmacology is so outdated that she cannot resume her former profession, but regardless of the truth of this, there is no suggestion that she cannot procure work. (Pharmacologists are paid $6.00 per hour, according to the record). The wife, apparently, has latterly continued her education, part-time, and now holds a degree in anthropology from Florida Atlantic University, but neither she, nor any of her graduate classmates, have been able to secure a job in this field.
The final judgment, insofar as alimony is concerned, awarded the wife $500.00 a month rehabilitative alimony for five years, and $500.00 a month permanent alimony, until his death or her remarriage. In addition, she was given possession of the house for five years (she was already the owner of record of an undivided one-half thereof and her assets were used to collateralize a second mortgage when it was purchased) and the husband required to pay the mortgage and taxes during that period, which he can deduct. At the end of the five years, the house is to be sold and the proceeds equally divided.
The foregoing recitation of facts and circumstances in the case now before us, is laborious and detailed; however, we find it neither a waste of time nor paper, because we would hope by this opinion to help clarify the law regarding alimony where a breakup of a long term family marriage is involved, and we perceive a tendency by some trial courts, to undercompensate the wife. It would appear that, in some instances *354 at the trial level, the result has very much hinged upon the luck of the draw depending upon which division in the courthouse gets the case; however, we see no such variation at the appellate level, where the recent case law on this kind of long term family marriage breakup has been reasonably uniform. Much of what we will say hereafter has already been covered in a shorter form by Chief Judge Mager in Gordon v. Gordon, 335 So.2d 321 (Fla. 4th DCA 1976) but we shall repeat it, and expand upon it, for future reference at the trial level.
The history of the change in alimony concept, up through the new dissolution of marriage law and beyond, is best set forth by Judge Rawls in the case of Brown v. Brown, 300 So.2d 719 (Fla. 1st DCA 1974), and we see no purpose to repeat it here. Suffice it to say that reasonable permanent alimony still lives, especially, in dissolutions involving the long time role of a mother and housewife.
Alimony is traditionally predicated on three criteria: (1) the ability of the husband to pay it, (2) the needs of the wife compared to reasonable expectations from her own income, and (3) the standard of living enjoyed by the wife during marriage. Caracristi v. Caracristi, 324 So.2d 634 (Fla. 2nd DCA 1976). In turn, these three criteria have, in developing case law, been supplemented by six more: (4) the length of the marriage; (5) the number of children. (Included in this category should be the extent to which the wife has been required to do the actual housework and perform the chore of raising the children, vis a vis the amount of outside domestic assistance paid for by the husband;) (6) the relative health and physical condition of both the wife and the husband, and (7) the extent of the contribution by the wife to her husband's successful career.[2]
An eighth factor considered by the courts concerns the conduct, or misconduct, of the parties during the marriage. Oliver v. Oliver, 285 So.2d 638 (Fla. 4th DCA 1973). This particular category is cited with some reluctance, (although in the light of case law, it would be remiss to exclude it) for we recognize that, inevitably, a consideration of conduct involves a retrogression back to the fault concept and away from no fault; however, in Oliver the Court was careful to point out that the extent of such evidence should be limited, at the trial judge's discretion. Moreover, in Oliver, it would appear that the misconduct was gross, for the wife claiming alimony was all the time drunk, repeatedly threatened to kill her husband and made no effort whatever to keep house. The Oliver court permitted such testimony to be considered by the chancellor below on the basis of Florida Statute § 61.08(2) (1975), which says:
In determining a proper award of alimony, the court may consider any factor necessary to do equity and justice between the parties. (emphasis supplied).
By contrast, there is no suggestion in the record now before us of any misconduct by Dr. McAllister, but likewise, there is no indication that Mrs. McAllister was other than a good spouse. At all events, we *355 would urge that evidence of misconduct be limited to gross situations such as existed in Oliver, with no mitigating circumstances, otherwise, as was conceded in that case, we will return to the very type of "... often sordid and provocative testimony of fault ... that lead to the enactment of the so-called no-fault dissolution of marriage chapter." Id. at 640.
Finally, there is a ninth catch all consideration set forth in Kennedy v. Kennedy, 303 So.2d 629 (Fla. 1974), where the Supreme Court said that while alimony should not result in one spouse having to "... pass automatically from misfortune to prosperity, neither should a good [spouse] suffer a shocking change from prosperity to misfortune."
In the case now before us, we find all nine of these criteria present, in one form or another, although we quickly point out that the list is intended only as exemplary and neither exclusive nor demanding of the presence of all nine. Mrs. McAllister contributed to the early success of her healthy husband, who is well able to provide support, was married to him for 24 years, enjoyed a high standard of living and community prestige as his wife, will need financial help desperately at the end of five years, and bore her husband four children. By including the number of children as one of the nine significant factors, we do not mean to promote child bearing as an indirect form of future planning in order to insure alimony. After all, child support payments are more appropriate for that; however, it is axiomatic that a husband is a willing participant in the very existence of offspring, and their pre- and post-natal presence, in significant numbers, is a formidable obstacle to the mother pursuing a more financially rewarding career.
The award of permanent alimony in this case was $6,000 per year. The tax laws permit a deduction for that and the award will only actually cost Doctor McAllister half that sum, which in net effect, will hardly discomfit his life style by more than the sacrifice of one elk hunting trip to Wyoming a year. His wife, by contrast, will be devastated, and Mrs. McAllister, her children now adult, (the last is 18 this year), is left with little but her memories. Such is neither just, nor proper, nor is it the law of this State. Indeed, a ruling to the contrary would require society to re-classify the traditional all-American concept of Mom and apple pie and re-label it a most hazardous occupation that all young girls should be dissuaded from.
It is normally not our function to set the amount of the award, but in a case such as this, the trial court must allow a wife to continue with some semblance of her former standards while at the same time ensuring that the husband is not strapped so that his incentive to strive forward and his lust for life are seriously impaired. By so ruling, we do not intend to lend support to the thought that a middle aged healthy woman need not go out to work. In our society, today, women, more often than not, are required to work until retirement and there is no reason to excuse Mrs. McAllister from doing the same just because her former position allowed her to follow a more traditional role. On the other hand, it must be remembered that at her age and level of earning experience, Mrs. McAllister is unlikely to become a great financial success story, and in all probability she will not achieve other than a very modest income.
Accordingly, mere rehabilitative alimony is not enough; however, the award of reasonable permanent periodic alimony does not forever enslave the husband, because significantly changed circumstances, either his or hers, are well settled in the law as a basis for later modification thereof. As was said in Wilson v. Wilson, 279 So.2d 893 (Fla. 4th DCA 1973), "Nil prospects to the contrary notwithstanding, if she should somehow blossom into a financially productive member of society and other material changes occur, the husband can obtain a trial court review of the award".
We therefore reverse and direct an increase in the permanent periodic alimony from $500.00 to $1,000.00 per month during the first five years encompassed by the judge's final order. At the end of said *356 period, after, and not before, the house has been sold and the husband no longer required to pay the mortgage payments and taxes on the house, the permanent periodic alimony shall be increased to $1,500.00 per month, until his death or her remarriage. The $500.00 per month rehabilitative alimony is hereby cancelled.
In so holding, we recognize that this decision does little more than repeat the same award as was made by the trial court, except that the total sum arrived at is permanent, rather than a combination of permanent and rehabilitative. Such a similar result is reached by us in deference to the trier of the fact who was out there on the firing line, which we were not; however we would comment that the award is low.
It should also be noted that we have not forgotten the possibility of lump sum alimony being appropriate, but cannot find the trial judge's decision in this regard to be an abuse of discretion under the facts and circumstances of this case.
As to the Winslow Homer painting, not referred to by the trial court, Doctor McAllister has sold it and kept the entire net proceeds of $12,500, yet his ex-wife was obviously a half owner of said painting since it came with the home and was included in the purchase price thereof. The title to said real estate was formerly a tenancy by the entirety and is now a tenancy in common. The same tenancy may be ascribed to the painting. The Doctor is directed to pay Mrs. McAllister $6,250.00.
In all other respects, the final judgment is affirmed.
ALDERMAN and ANSTEAD, JJ., concur.
NOTES
[1] It is not reflected in the record that he could not have finished his education but for her earnings.
[2] Points 4 through 7 above include:

DeCastro v. DeCastro, 334 So.2d 834 (Fla. 3rd DCA 1976); Dorman v. Dorman, 332 So.2d 358 (Fla. 1st DCA 1976); Hausman v. Hausman, 330 So.2d 833 (Fla. 3rd DCA 1976); Norton v. Norton, 328 So.2d 484 (Fla. 1st DCA 1976); Gall v. Gall, 336 So.2d 10 (Fla. 2nd DCA 1976); Fugassi v. Fugassi, 332 So.2d 695 (Fla. 4th DCA 1976); In re Marriage of Stevens, 327 So.2d 851 (Fla. 4th DCA 1976); Sommese v. Sommese, 324 So.2d 647 (Fla. 1st DCA 1976); Nevins v. Nevins, 305 So.2d 63 (Fla. 3rd DCA 1975), cert. den. 327 So.2d 33; Newberger v. Newberger, 311 So.2d 176 (Fla. 4th DCA 1975); Brook v. Brook, 289 So.2d 766 (Fla. 3rd DCA 1974), cert. den. 300 So.2d 895; Ruhnau v. Ruhnau, 299 So.2d 61 (Fla. 1st DCA 1974); Keller v. Keller, 308 So.2d 106 (Fla. 1974); Schultz v. Schultz, 290 So.2d 146 (Fla. 2nd DCA 1974); Brown v. Brown, 300 So.2d 719 (Fla. 1st DCA 1974), cert. dism. 307 So.2d 186; Dash v. Dash, 284 So.2d 407 (Fla. 3rd DCA 1973); Suter v. Suter, 279 So.2d 325 (Fla. 1st DCA 1973), cert. den. 284 So.2d 396; Sharpe v. Sharpe, 267 So.2d 665 (Fla. 3rd DCA 1972); Calligarich v. Calligarich, 256 So.2d 60 (Fla. 4th DCA 1971). We refer the reader to Florida Dissolution of Marriage (1976) Florida Bar C.L.E., p. 391, et. seq., for a detailed analysis of the cases cited.