## PULITZER v. PULITZER
Case No. 81-5263 CA (D) 03K
Fifteenth Judicial Circuit, Palm Beach County
December 28, 1982

Robert T. Scott and Mark T. Lattier, for plaintiff.

Joseph D. Farish, Jr. and Louis L. Williams, for defendant.

CARL H. HARPER, Circuit Judge.

THIS CAUSE was tried before the court over a protracted period of approximately eighteen days, commencing on September 20, 1982 and concluding on November 9, 1982. The husband, Herbert Pulitzer, Jr., was present and represented by able counsel, Robert T. Scott, Esquire and Mark T. Luttier, Esquire. The wife, Roxanne D. Pulitzer, was also present and represented by able counsel, Joseph D. Farish, Jr., Esquire and Louis L. Williams, Esquire. The court has heard the extensive testimony of the parties and their witnesses, received numerous exhibits in evidence, and heard the closing arguments of respective counsel. The

court has also reviewed the husband's Memorandum of Law received on November 16, 1982; the wife's Memorandum of Law received on November 29, 1982; and the husband's Reply Memorandum received on December 7, 1982, all of which shall be filed of record in this cause. The court has also considered, but hereby rejects, the proposed final judgments submitted on behalf of each party.

Our so-called "no fault" divorce law was ostensibly enacted, in part to eliminate the emotional and financial blackmail made possible by the continued threat of mental torture by way of embarrassing harassment through public washing of dirty linen, as was noted by Judge Letts in *Linda v. Linda,* 352 So.2d 1208 (4 DCA 1977). In spite of that laudible goal, section 61.08(1), Florida Statutes, expressly authorizes evidence of adultery on the part of a spouse who seeks alimony, and further provides that "the court may consider any other factor necessary to do equity and justice between the parties". Also, section 61.13(3)(f), Florida Statutes, expressly provides, among other criteria, that trial courts shall consider "the moral fitness of the parents" in order to determine the best interests of the minor child whose custody is an issue.

Throughout the trial of this case and in writing this judgment, this court was ever mindful of its obligation under *McAllister v. McAllister,* 345 So.2d 352 (4 DCA 1977), not to mention this court's own human compassion and empathy for the parties and witnesses, to limit such evidence of misconduct to gross situations so as to avoid "the effect a detailed probe into the private lives of the parties might have on the innocent children involved, not to mention the disruptive effect such an inquiry might have upon the married lives of third persons involved in the illicit conduct and their children", *Claughton v. Claughton,* 344 So.2d 944 (3 DCA 1977). However, that is a difficult task that is more easily said than done, under our law.

This hotly contested trial was duly reported by two court reporters, televised gavel to gavel and was highly publicized on the front pages of many newspapers throughout the world. No useful purpose would be served in detailing the sordid evidence herein, except to unnecessarily add to the grief and shame already endured by the parties and witnesses, and their families, and to unduly lengthen this written judgment. Nevertheless, this court is legally obliged to make written findings of fact, based on the evidence presented, in support of its judgment, in compliance with *Beville v. Beville,* 415 So.2d 151 (4 DCA 1982) and *Vawter v. Vawter,* 419 So.2d 747 (4 DCA 1982).

Therefore, based on the greater weight of the credible evidence presented at trial, after having closely observed the parties and their witnesses and having considered their appearance and demeanor, and

having weighed their credibility; and after giving due consideration to the arguments of respective counsel; and being fully advised in the premises, the court makes the following

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This court has jurisdiction of this cause and of the parties in that the parties have been bona fide residents of the State of Florida for more than six (6) months immediately prior to the filing of this dissolution action. The parties were married on January 12, 1976 in the Town of Palm Beach, Palm Beach County, Florida where they cohabited until their last separation in late August or early September, 1981. There were two children born of this marriage on August 28, 1977, twin boys named MacLean Simpson Pulitzer and Zachary Simpson Pulitzer, more affectionally known as Mack and Zack, each of whom is presently in the temporary custody of the wife pursuant to this court's order dated February 1, 1982, residing in the marital home located at 410 North Lake Way, Palm Beach, Florida.

This was the second marriage for both parties. The wife's first marriage ended in divorce in 1973 or 1974. There were no children born of that marriage. The husband's first marriage ended in divorce in July, 1969. There were three children born of that marriage, the custody of whom was awarded to the former wife. Subsequent to that divorce, the husband maintained a close personal contact and relationship with the children, all of whom are now emancipated and living on their own. The husband has enjoyed a good relationship with his former wife who is a well known, highly successful business woman in her own right.

The husband is 52 years of age and is in excellent health, both emotionally and physically. He completed high school at a private boarding school in Massachusetts, one year college at Stanford University and one year college at the University of Virginia. Throughout his adult life, he has been a hard worker and has invested his money wisely, with much financial success. He is a self-made millionaire, several times over. He refers to himself as a "hotel executive", and owns many properties and other investments, both real and personal, too numerous to catalogue herein, not the least of which are a resort hotel in Miami Beach, Florida and a fifty-one percent controlling interest in a resort hotel in Amsterdam, Holland. He is very active in overseeing his investments, early to bed and early to rise, but has still found time to enjoy his family life and hobbies. He has travelled extensively with his wife and children throughout Europe, the Caribbean and South America. He is a sportsman and enjoys diving, boating, hunting and fishing, particularly in the company of his two boys, Mack and Zack. In short, he is a "man's man".

The husband's net worth is in hopeless dispute. Much time has been unnecessarily spent, in pretrial discovery and at trial, in an effort to resolve the dispute. The husband estimates his net worth to be about $2,618,475, whereas the wife estimates his net worth to bé about $25,000,000. After considering all the financial evidence, a fair estimate of the husband's net worth is in the neighborhood of $12,500,000 (a nice neighborhood, to say the least) with an annual spendible income of about $240,000, except for the year 1982 when he experienced a $180,000 shortfall due largely to this lawsuit. In any event, the husband's net worth is more than adequate to meet the financial obligations that will be imposed upon him in this judgment.

The wife is 31 years of age, attractive and is in apparent excellent physical health. She has experienced some emotional problems in the past relating to the marital discord for which she has been treated by medical care, hospitalization and therapeutic counselling, mostly at the insistence of the husband in an effort to save the marriage.

At the request of the husband, the wife has remained unemployed throughout this marriage in order that she might be available to travel with the husband on his business and pleasure trips. However, she has a two year degree from Palm Beach Junior College and has done secretarial work in the past, prior to this marriage. With some self-motivation and rehabilitation, the wife is capable of gainful employment. In time, she can become self-supporting, but not to the extent she could afford the same lavish lifestyle she enjoyed during this marriage. Even when (as here) there is no financial problem, it might well be thought improper to permit an errant spouse to destroy a marriage and then to claim benefits equal to those which would have been provided had it remained intact. *Smith v. Smith*, 378 So.2d 11, 15 (3 DCA 1979). Also, habituated living standards is but an element to be considered (among others) and is not the equivalent of need. *Quick v. Quick*, 400 So.2d 1297 (1 DCA 1981).

## THE DISSOLUTION ISSUE:

As to the dissolution issue, under our no fault law, fault in causing the marriage breakup is not relevant. Suffice it to say that the voluminous evidence clearly demonstrates that this marriage of relatively short duration is unfortunately irretrievably broken and has been for well over a year now.

## THE CUSTODY ISSUE:

As to the paramount issue in this case, i.e. the child custody question, the moral fitness of the parties is a factor, among others, that must be considered in determining the best interests and welfare of Mack and

Zack. Section 61.13(3)(f), Florida Statutes. In doing so, the court will make findings as to each party individually as follows:

(a) As to the wife

In the trial of this case, this court heard considerable testimony concerning the wife's alleged adulterous conduct with various male paramours, her alleged illicit relationship with a female family friend, and her alleged frequent and progressive abuse of cocaine and alcohol in combination.

To prove adultery, in a civil case, the law does not require that specific acts be attested by eye-witnesses. Because adultery usually takes place in secret or seclusion, proof thereof in most instances is by circumstantial evidence, through showing desire, by evidence of mutual affection or otherwise, coupled with opportunity under conditions or circumstances from which a reasonable judge of human nature would be led to conclude that adultery was committed. *Leonard v. Leonard*, 259 So.2d 529 (3 DCA 1972). Under Florida law, adultery is not merely confined to extra-marital heterosexual union, but also includes homosexual relationships as well. See *Patin v. Patin*, 371 So.2d 682 (4 DCA 1979).

Also, under Florida law, proof of adultery, standing alone, is not sufficient evidence upon which a trial court may base a finding of moral unfitness for child custody purposes. See for example *Farrow v. Farrow*, 263 So.2d 588 (2 DCA 1972), where the appellate court held that although the adulterous wife was a bad wife, she nevertheless was a good mother. Clearly then, under Florida law, in order for adultery to disqualify a spouse as a custodial parent of minor children, the evidence must also demonstrate that the adultery had a direct, adverse bearing on the welfare of the minor children. See *McAnespie v. McAnespie*, 200 So.2d 606 (2 DCA 1967); *Dinkel v. Dinkel*, 322 So.2d 22 (Fla. 1975); *Brock v. Brock*, 349 So.2d 782 (1 DCA 1977); and *Solly v. Solly*, 384 So.2d 208 (3 DCA 1980). But see also *Smothers v. Smothers*, 281 So.2d 359 (Fla. 1973), where the Florida Supreme Court upheld a custody award to the husband where the trial court based the award on the adulterous wife's overall "relationship with Moore" (her paramour), not just on her sex life with him.

Based on the totality of the credible evidence, both direct and circumstantial, this court finds that the wife's gross, moral misconduct involved more than isolated, discreet acts of adultery. She openly engaged in a continuing adulterous relationship with her male paramour, Brian Richards, both before and after the final separation of the parties and prior to the filing of this dissolution action. During that period of time, the wife frequently and progressively abused cocaine and alcohol

in combination. As a consequence, the parties previously separated and a prior dissolution action was filed. The parties remained separated from January to March, 1981. However, upon the wife having agreed to end her relationship with Brian Richards and to undergo treatment for her cocaine and alcohol abuse, the parties reconciled and resumed cohabitation in March, 1981, whereupon the husband dismissed the prior suit. They made a reconciliation trip to Europe, but upon her return to Palm Beach County prior to the husband, the wife immediately resumed her adulterous relationship with Brian Richards and continued to abuse cocaine and alcohol as before, directly leading to the final separation of the parties in late August or early September, 1981 and to the ultimate filing of this dissolution action on September 4, 1981.

As if that was not enough the wife thereafter began an adulterous relationship with James Murdock III who bragged of the affair to the witness, William Cheatham, but now denies having done so. In spite of Murdock's denial, this court finds Cheatham to be a credible witness.

The wife also began a questionable, meretricious relationship with Hubert Fouret and Jackie Ickz under circumstances that would lead a reasonable judge of human nature to conclude that adultery was committed. *Leonard v. Leonard,* supra. The court heard testimony, believed to be credible, about an occasion where the wife and Jackie Ickz were observed lying on a beach adjacent to the marital home, in the presence and view of the minor children, Mack and Zack, in amorous embrace, kissing each other. The credible evidence further showed that the wife and Ickz were also observed lying in bed together in the marital home where Ickz spent the night. Both children expressed some displeasure over the wife's behavior with Ickz.

As to Fouret, another credible witness was present on an occasion and observed the wife and Fouret lying on a couch in the marital home engaging in amorous sexual foreplay. The minor children were present in the home but did not witness that conduct. Brazenly, just prior to this trial, the wife and Fouret accompanied each other on an extended trip to Paris, France in August, 1982. Enroute, they spent 3 days and nights in New York City. The minor children were on court ordered visitation with the husband. The wife had informed the children's nanny, Pierrette Barr, that she was going to New York state to visit her mother, leaving a phone number where she could be reached in case of an emergency. The nanny's attempts to reach the wife at that number were unsuccessful, of course. Fouret testified that the wife has spent the night in his Palm Beach residence on two separate occasions, ostensibly because of robberies in her neighborhood. The children were not present, however.

Regarding the allegations of the wife's lesbian infidelity, a credible witness testified to having observed the wife and her female companion Jacqui Kimberly, lying together on a bed in the marital home in the Spring of 1979. According to the witness, Kimberly was nude and the wife was wearing a sheer negligee. Upon perceiving the presence of the witness, the wife inquired as to the purpose of his presence and, upon receiving a satisfactory explanation, the wife closed the bedroom door.

In addition to the above, from the inception of the birth of Mack and Zack, the wife has all but abandoned the raising of the children to various nannies employed for that purpose. See for example the tape recorded sworn statement (in evidence as husband's exhibit number 22) made by Sandra Andreasen, the wife's cousin. Much of the wife's abundant idle time is spent on her own personal pleasures such as visiting numerous nightclubs and discotheques, dancing and snorting cocaine, as well as consuming alcoholic beverages, until the wee hours of the morning. For a time, the husband participated with the wife. However, it was not long before the fast pace nightlife began to take its toll on the early rising husband who is 21 years older than his wife. For a time, the husband turned to cocaine, as a crutch, to give him the stamina to keep pace with his younger, energetic wife. When that failed, at the request of his wife, the husband began to leave his wife at the disco so that he could get some restful sleep before having to go to work. As could be expected, the wife began to stay out later and later, coming home after the husband had left for work and on occasion not at all.

The court also heard testimony from the husband's witness, Randy Hopkins, who testified to certain relations he allegedly had with Roxanne Pulitzer prior to this marriage. The wife's attorney timely objected to the testimony, but the court overruled the objection subject to striking the evidence before entry of this judgment. At this time, this court hereby sustains the wife's objection and strikes the testimony of Hopkins as being irrelevant and immaterial to any of the issues involved herein. Accordingly, that testimony has played no role in the entry of this judgment. Furthermore, the evidence relating to the wife's alleged belief in spiritualism and the occult has played no role in the entry of this judgment.

(b) As to the husband

The credible evidence has clearly demonstrated that since the inception of this marriage the husband has been faithful and loyal to the wife. He has been a good husband to the wife and father to the children. In fact, the wife has made no allegations of the husband's marital infidelity

prior to the final separation or of his moral unfitness as custodian of the children.

Nevertheless, the husband has not survived this trial unscathed and without blemish. The wife testified that, prior to this marriage, the husband had allegedly engaged in an incestuous relationship with one of his daughters by his prior marriage. Both the husband and the daughter vehemently denied the uncorroborated allegations. Also, the wife had made pretrial statements that she did not believe such allegations. After weighing the evidence and credibility of the witnesses, this court gives no credance to the unfounded allegations either.

The husband testified that well subsequent to the final separation of the parties he began a relationship with Jane Dean. While that relationship was meretricious, it had no causal connection with the marriage breakup, but rather was a by-product of the broken marriage.

At this time, the court feels it appropriate to comment on the demeanor of the parties as it relates to their credibility and in weighing the evidence. Although the court was busily engaged in taking detailed, copius notes during the lengthy trial, the court nevertheless closely observed the appearance and demeanor of the witnesses, and in particular the parties, throughout the trial. As to the husband, this court could readily observe the embarrassment, painful hurt and frustrating concern exuding from his doleful eyes and aging face. By contrast, the wife nonchalantly sat at the table "doodling" on a note pad as though unconcerned. As the husband and his witness, Janice Nelson, were testifying, the wife engaged them in vitriolic stares, eventually staring them down. Frankly, the court was somewhat relieved when, toward the end of the eighteen day trial, the wife finally broke into tears, necessitating a brief recess, indicating that she was, after all, capable of human emotion and concern. The husband's testimony and evidence had the ring of truth, whereas the denials of the wife and her paramours were patently false and knowingly given.

Applying the above evidentiary findings to the criteria enumerated in section 61.13(3)(a) through (j), Florida Statutes, which became effective on July 1, 1982, this court hereby determines that the best welfare and interests of the minor children would be served by ordering shared parental responsibility, but provided that the primary physical residence of the minor children shall be with the husband, subject to the right of reasonable visitation to the wife. See the cogent objective custody investigation report of Sheri Rifenberg, counselor of the Juvenile and Family Division of this court, in evidence as husband's exhibit number 20; the testimony of Sheri Rifenberg and the very impressive testimony of Dr. Theodore H. Blau, child psychiatrist, both of whom recommend

the husband as primary custodian of the children, in preference to the wife. To do otherwise would continue to be adverse and detrimental to the moral and social health, safety and welfare of the children.

The husband is likely to allow the children frequent and continuing contact with the wife. There is love, affection and other emotional ties existing between the husband and the children in spite of the wife's disparaging statements to the children designed to alienate their affection for the husband. As between the parties, the husband has the greater capacity and, more importantly, the disposition to provide the children with food, clothing, medical care or other remedial care recognized and permitted under the laws of this State in lieu of medical care, and other material needs. The children have spent their entire lives in the marital home owned by the husband. Unlike the wife, the husband has strong family ties and vast financial investments in Palm Beach County and South Florida thereby insuring the permanence of the children's residence and continuing educational needs.

In so ruling on the child custody issue, this court has given due consideration to Florida's so-called "tender years doctrine". Under that doctrine, mothers have historically been the preferred custodian of children of tender years when all other factors are equal. The doctrine is predicated on the premise that a child between the age of six months and three years establishes a bonding attachment to the mother, as a primary caretaker, and the bonding is essential to the wholesome emotional development of the child; and that to deprive a child of the primary caretaker during the bonding period has a destructive effect on the child's intellectual, physical, and psycho-social development. See *Agudo v. Agudo,* 411 So.2d 249 (3 DCA 1982).

However, the tender years doctrine has from time to time been eroded. See for example the recent legislative amendment to section 61.13(2)(b) 1, effective July 1, 1982, which now provides, "upon considering all relevant factors, the father of the child shall be given the same consideration as the mother in determining custody *regardless of the age of the child"*.

Nevertheless, even without regard to the effect of that amendment on the "tender years doctrine", this court finds that the doctrine is inapplicable under the facts of this case. As noted hereinabove, all other factors are not equal because of the wife's flagrant adultery and other gross marital misconduct; the wife has abandoned the primary caretaker role to nannies and the husband; and the children are well beyond the bonding age.

## THE ALIMONY ISSUE:

At the outset, it should be noted that according to the proposed final judgment submitted on behalf of the wife, the wife, in addition to seeking custody of the children, also seeks a total of $6,000 per month child support; full ownership and possession of the marital home and its contents as lump sum alimony, which she estimates has a value of $1,500,000 according to her financial affidavit filed on February 16, 1982 (she wants the home free and clear of the outstanding mortgage); in addition to $6,000 per month as permanent, periodic alimony; a one-third special equity interest in the husband's boat, Sea Hunter, which has a present fair market value of $169,000; and $300,000 attorney's fee, plus court costs. The wife's exhorbitant demands shocks the conscience of this court, putting the court in mind of the hit record by country music singer, Jerry Reed, which laments, "She Got the Gold Mine, I Got the Shaft."

Section 61.08(1), Florida Statutes, as noted above, expressly provides (among other factors) that "the court *may consider the adultery of a spouse and the circumstances thereof* in determining whether alimony shall be awarded such spouse and the amount of alimony, if any, to be awarded"; and the statute concludes by expressly providing that "the court *may consider any other factor necessary to do equity* and justice between the parties." Therefore, under Florida law, adultery and other gross marital misconduct of a spouse seeking alimony are factors, among others, that a trial court should consider within the limits expressed by the Florida Supreme Court in *Williamson v. Williamson,* 367 So.2d 1016 (1979). See also *McAllister v. McAllister,* 345 So.2d 352 (4 DCA 1977), for an excellent discussion of all the factors to be considered.

Proof of adultery or other gross marital misconduct is not an absolute bar to an alimony award to the offending spouse. On the contrary, the decision to either grant alimony (and the amount thereof) or to deny alimony outright is a matter resting within the broad judicial discretion of the trial court. *Canakaris v.Canakaris,* 382 So.2d 1197 (Fla. 1980). The trial court's discretion is not an arbitrary discretion, but is governed by evidence as to the needs of the spouse seeking alimony, the ability of the other spouse to financially respond to the need, taking into consideration the lifestyle and standard of living enjoyed during the marriage, as well as the other factors enumerated in section 61.08 and discussed in *McAllister v. McAllister,* supra. Trial courts need not equalize the financial position of the parties, but must insure that neither spouse passes automatically from misfortune to prosperity or from prosperity

to misfortune, and, in viewing the totality of the circumstances, one spouse should not be "shortchanged." *Canakaris,* supra, at page 1204.

In this day and time, women are as well educated and trained in the arts, sciences, and professions as are their male counterparts. The law protects them in their right to independently acquire, encumber, accumulate, and alienate property at will. They now occupy a position of equal partners in the family relationship resulting from marriage. The woman continues to be as fully equipped as the man to earn a living and provide for her essential needs. Therefore, the fortuitous circumstance created by mere recitation of the marriage vows neither diminishes her capacity for self-support nor does it give her a vested right in her husband's earnings for the remainder of her life. *Cummings v. Cummings,* 330 So.2d 134, 136 (Fla. 1976).

The wife has clearly demonstrated her need for alimony and the husband's financial ability to respond. However, upon due consideration of the criteria enumerated in *McAllister v. McAllister* and *Canakaris v. Canakaris,* supra, in order to do equity and justice between the parties, and in reliance upon *Patin v. Patin* and *Beville v. Beville,* supra; *Pro v. Pro,* 300 So.2d 288 (4 DCA 1974), and *Oliver v. Oliver,* 285 So.2d 638 (4 DCA 1973), this court hereby denies the wife's claim for alimony in all forms except rehabilitative alimony. In so doing, this court finds that while the parties enjoyed a lavish lifestyle and standard of living during this marriage, the marriage was of relatively short duration; the wife is young, attractive and healthy and is fully capable of gainful employment after a reasonable period of rehabilitation; the wife's financial and domestic contributions to this marriage and to the husband's career building were minimal to say the least; and, as fully articulated hereinabove, the wife continuously engaged in adultery and other gross marital misconduct, outweighing all favorable factors.

THE SPECIAL EQUITY ISSUE:

The term "special equity" was created to describe a vested interest in property brought into the marriage or acquired during the marriage because of contributions of funds or services over and above normal marital duties. *Canakaris v. Canakaris,* supra, at page 1200. A "special equity" in its true term is not a form of alimony nor a substitute therefor. *Duncan v. Duncan,* 379 So.2d 950 (Fla. 1980) and *Ball v. Ball,* 335 So. 2d 5 (Fla. 1976).

Herein, the wife claims a special equity in the husband's resort hotels in Amsterdam, Holland and Miami Beach, Florida and in the husband's seagoing vessel, the Sea Hunter. The undisputed evidence clearly shows that the husband's substantial assets and properties, both real and

personal, were acquired by him through his own blood, sweat and tears well in advance of his marriage to Roxanne D. Pulitzer, and remain titled in his sole name. Any improvements to the properties subsequent to the marriage were made with funds either earned by the husband or with borrowed funds for which the husband is solely responsible to repay. The only assets brought to this marriage by the wife was a used Lincoln automobile of unknown value and an undivided one half interest in a mobile home which she acquired in her prior divorce. Throughout this short-term marriage, the wife made no financial contributions (except as noted hereinafter) to the marriage and did not contribute extraordinary services over and above the normal household duties, which were nominal, or in the husband's career building, nor did she sacrifice her own career and educational opportunities.

Nevertheless, the wife did eventually receive $7,000 for her one-half interest in the mobile home referred to above. The wife donated the $7,000 to her husband to be used in the building of his seagoing vessel, Sea Hunter, which was built in 1975 and 1976 at a total cost of $275,630. The wife also assisted in building the Sea Hunter by helping the husband paint and varnish the vessel. However, the wife did not offer any proof as to the extent and value of those services, and for the court to evaluate those services would be pure conjecture. In any event, earlier this year, the husband attempted to sell the Sea Hunter for $169,000, but the sale fell through because the purchaser's deposit check did not clear. The vessel is still on the sales market. Based on the asking price, this court finds that the present fair market value of the Sea Hunter is $169,000, after depreciation. Therefore, based on the formula enunciated in *Landay v. Landay,* 400 So.2d 43 (2 DCA 1981) now pending certiorari in the Florida Supreme Court, but nevertheless binding on this court pursuant to *State v. Hayes,* 333 So.2d 51 (4 DCA 1976), this court, in equitable distribution between the parties, finds (and the husband concedes) that the wife has established a $7,000 special equity in the Sea Hunter irrespective of the fact that the *Landay* formula would apply to the $169,000 depreciated valaue of the Sea Hunter. *Canakaris v. Canakaris,* supra.

The wife's special equity claim in the husband's resort hotels in Amsterdam and Miami Beach is based on her assertion that she assisted her husband in selecting material colors and patterns for two suites in the husband's 190 room Amsterdam hotel and one room in his 137 room Miami Beach hotel. However, the wife did not offer any proof as to the value of this minimal service or as to the enhancement of the value of the hotels or any increase in operating profits derived therefrom. This court cannot in good faith conclude that the wife's services materially benefited the husband or his hotels, or that the services were above and

beyond the normal marital duties. Therefore, the wife's claim to a special equity interest in the husband's hotels is denied for failure of proof.

## ATTORNEY'S FEES AND COURT COSTS:

From the very outset of this lawsuit, the undisputed evidence clearly demonstrates the wife's need for a reasonable attorney's fee, suit money and court costs in her defense thereof, as well as the husband's financial ability to respond without financial disaster to him, and so as to avoid an inequitable diminution of the fiscal sums awarded to the wife herein. *Canakaris v. Canakaris,* supra. In addition to the testimony of her own counsel, the wife presented the testimony of three well-known, experienced lawyers who practice law in the local community, whereas the husband presented the testimony of one local lawyer of equal professional stature. No useful purpose would be served in summarizing that testimony except to otherwise lengthen this already too lengthy written judgment.

According to the wife's evidence, her lawyers devoted in excess of 800 man hours in preparation of this case for trial and at trial. Her expert evidence indicates a reasonable fee to be in the range of $250,000 to $325,000. By contrast, the husband's expert evidence indicates a reasonable fee to be in the range of $75,000 to $135,000 depending on whether this trial results in a judgment favorable to the wife. Regarding the attorney's fee question, there were charges and counter-charges of vexatious and obstructive strategies on the part of counsel for both parties.

To make a long story short, after giving due consideration to the proofs, and taking into consideration all the factors enumerated in Disciplinary Rule 2-106, Code of Professional Responsibility, and in particular considering that this trial resulted in a judgment unfavorable to the wife on the paramount issues, this court hereby finds that a reasonable attorney's fee to be awarded to the wife is $90,000 in addition to the $12,500 temporary attorney's fee previously awarded to the wife's counsel in this court's order dated June 2, 1982. In so doing, the court has weighed the quality of legal services provided to the wife against the less probative quantity of those services. While it is true that the husband has a "deep pocket," it is not without a bottom.

Accordingly, based on the above findings of fact and conclusions of law, it is

ORDERED, ADJUDGED AND DECREED as follows:

1. The marriage between the parties, Herbert Pulitzer, Jr. and Roxanne D. Pulitzer, is dissolved because the marriage is irretrievably broken.

2. Pursuant to section 61.13, Florida Statutes, the parental responsibility for the minor children, MacLean Simpson Pulitzer and Zachary Simpson Pulitzer, shall be shared by Herbert Pulitzer, Jr. and Roxanne D. Pulitzer (hereinafter referred to as parents). The parents shall retain full parental rights and responsibilities with respect to the children. Both parents shall confer so that major decisions affecting the welfare of the children will be determined jointly. In particular, both parents shall confer and share in matters relating to the religion, education, medical and dental care of the children.

It is the intent of this court that the children maintain and enjoy as close an association with each parent as the circumstances allow, consistent with the best interests and welfare of the children, petty differences between the parents notwithstanding.

Each parent shall conduct himself, and herself, in such a manner so as to cause minimum upset to the children, and neither parent shall alienate, by word or deed, the affection of the children for the other parent, and each parent shall consider the other in the exercise of these rights and responsibilities.

3. The primary physical residence of both children, MacLean Simpson Pulitzer and Zachary Simpson Pulitzer, shall be with the husband, Herbert Pulitzer, Jr., subject to frequent, continuing and reasonable contact and visitation with the wife, Roxanne D. Pulitzer, at such times and places as the parties may agree, as set forth in the companionship schedule attached hereto as Exhibit "A" and subject to its conditions, which exhibit is adopted and incorporated herein by reference. Provided, however, that Roxanne D. Pulitzer shall not remove the children, or either of them, from Palm Beach County, Florida without prior written consent from Herbert Pulitzer, Jr. or upon prior written order of this court. Herbert Pulitzer, Jr. shall not remove the children, or either of them, from the State of Florida for more than thirty (30) consecutive days except upon prior written order of this court.

4. Roxanne D. Pulitzer shall peacefully vacate the marital residence located at 410 North Lake Way, Palm Beach, Florida on or before January 10, 1983. Upon vacating the marital residence, the wife shall remove all her belongings of a personal nature. Provided, however, that the wife shall give the husband at least twenty-four (24) hours notice of the date and time she vacates the marital residence and/or

removes her personal effects so that the husband or his agent may be present. Any reasonable moving expenses incurred shall be at the expense of the husband.

5. The husband shall pay to the wife, as rehabilitative alimony, the sum of $2,000 per month for twenty-four (24) consecutive months or until the wife remarries or dies or the husband dies, whichever event occurs first, payable on or before the 10th day of each month following the date of this final judgment. *Canakaris v. Canakaris,* supra, and *Reback v. Reback,* 296 So.2d 541 (3 DCA 1974). The wife's claim for alimony in all other forms is denied.

6. The wife is hereby awarded a special equity in the husband's sea going vessel, the Sea Hunter, by virtue of her $7,000 cash contribution from a source unconnected with the marriage relationship, including her labor and services. The husband shall pay directly to the wife the sum of $7,000 on or before January 10, 1983 in settlement of her special equity interest in the Sea Hunter. In all other respects, the wife's special equity claims are denied.

7. The husband shall pay directly to the wife's counsel, Farish, Farish and Romani, as a reasonable attorney's fee, the sum of $90,000 in addition to the $12,500 temporary attorney's fee awarded in this court's order dated June 2, 1982, to be paid in equal installments. The first installment shall be paid on or before February 14, 1983 and the last installment shall be paid on or before April 4, 1983.

8. This court's previous order dated April 23, 1982, commonly refered to as a "gag order," is hereby vacated. The parties and respective counsel are hereby released from the restraints thereof, within their personal discretion and freedom, except that respective counsel, as lawyers and officers of this court, shall continue to be governed by the letter and spirit of the ethical standards of the Code of Professional Responsibility and in particular Disciplinary Rule 7-107 (G).

9. Except for the dissolution of this marriage, the court reserves jurisdiction of this cause and of the parties to enter such orders as may from time to time become necessary, including but not limited to the assessment and allocation of court costs to the wife upon reasonable notice and proper proof in accordance with the Florida Supreme Court's Administrative Order, dated October 28, 1981, In RE: Statewide Uniform Guidelines for Taxation of Costs in Civil Actions.

In response to those who may find this court's judgment unduly harsh, this court would only state in conclusion that there are three parties to every marriage contract, namely the wife, the husband, and the State that licensed the marriage or in which the marital cohabitation

continued. The marriage union, and its concomitant family unit, is the very bedrock upon which our society is built. Flagrant acts of adultery and other gross marital misconduct demeans the sanctity of the marriage and family unit, and will not be tolerated by an enduring society. Where such transgressions are shown, appropriate sanctions must be imposed as between the parties, not to mention the deterrent effect on other spouses so inclined. As noted previously herein, it is improper to permit an errant spouse to destroy a marriage and then to claim benefits equal to those which would have been enjoyed had the marriage remained intact. *Smith v. Smith,* supra. The wife entered this marriage with limited financial resources, a used automobile of unknown value and a $7,000 interest in a mobile home. Upon departing the marriage, which she destroyed, she takes with her a $20,000 Porsche automobile purchased with the husband's funds; about $60,000 in jewelry purchased in large measure with the husband's funds; $48,000 in rehabilitative alimony; $7,000 cash equity in the husband's boat; and $102,500 in attorney's fees.

## COMPANIONSHIP SCHEDULE

Liberal visiting arrangements are encouraged, as contact with both parents is important to the children. Specific items in the Final Judgment take precedence over this schedule. Changes or modifications can be made by the Court if need for such is shown.

1. *AT SUCH TIMES AND PLACES AS THE PARTIES MAY AGREE. This will Not Normally Be Less Than:*

2. *Weekends:*   Alternate weekends from Friday at 6:00 p.m. until Sunday at 6:00 p.m.

3. *Holidays:*   In the odd-numbered years, mother has Easter, July 4th, Thanksgiving and Christmas Day; and father has Memorial Day, Labor Day, and Christmas Eve. In the even-numbered years, the schedules are reversed.

a.   A holiday that falls on a weekend should be spent with the parent who is supposed to have the children for that holiday. The rest of the weekend is to be spent with the parent who would normally have that weekend. These do not have to be made up.

b.   48-hour notice should be given by the noncustodial parent to the custodial parent of intentions about the holidays.

c.   Mother's Day and Father's Day are to be spent with the appropriate parent. These are as agreed or 10 a.m. until 7 p.m. (any school requirements take precedence).

d.   Other days of special meaning, such as Religious Holidays, etc. should be decided together, written down and alternated as above.

e.   Hours for parents who can not agree are as follows: Easter (10 a.m.-7 p.m.), Memorial Day (9 a.m.-9 a.m. the next day, not to interfere with school), July 4th (9 a.m-9 a.m., the next day), Labor Day (9 a.m.-9 a.m. the next day, not to interfere with school), Thanksgiving (9 a.m.-9 a.m. the next day), Christmas Eve (9 p.m. Dec. 23-9 p.m. Dec. 24), Christmas Day (9 p.m. Dec. 24-9 p.m. Dec. 25).

4.   *Birthdays*:   The child shall celebrate his/her birthday in the home of the custodial parent, unless it falls on a visitation day, and the other parent can celebrate at another time if desired.

5.   *Waiting*:   The children and the custodial parent have no duty to await the visiting parent for more than 30 minutes of the visitation time. A parent who is late forfeits companionship for that period.

6.   *Cancellations*:   If a child is ill, the custodial parent should give 24-hour notice, if possible, so appropriate plans can be made. The noncustodial parent should give 24 hour notice to cancel. The time cancelled by the noncustodial parent is forfeited.

7.   *Vacations*:   Four weeks of companionship each year are to be arranged with 30 day advance notice by the noncustodial parent. The custodial parent must give the noncustodial parent 30 day notice of vacations or special plans for the child to avoid planning conflicts.

a.   Alternate weekends or holidays which normally would be spent with the *custodial* parent, and that fall during the *noncustodial* parent's vacation must be given to the *custodial* parent or made up at another time. Alternate weekends or holidays which normally would be spent with the *noncustodial* parent, and that fall during the *custodial* parent's vacation, must be given to the *noncustodial* parent or made up at another time. Hollidays and alternate weekends that are to be made up must be given/taken within 3 months.

b.   Summer school necessary for the child to pass to the next grade must be attended.

c.   A general itinerary should be provided for the custodial parent if vacation will be out of town.

8.   *Moving*:   For parents residing in different locations that make the above schedule impractical, consult the Court.

*   Taken from recommended schedule of the Lucas County, Ohio Court of Common Pleas

**Exhibit "A"**