# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D16-5849
_____

SCOTT ANTHONY MITCHELL,

    Appellant,

    v.

TAYLOR N. BROGDEN,

    Appellee.

_____

On appeal from the Circuit Court for Duval County.
Elizabeth A. Senterfitt, Judge.

July 16, 2018

PER CURIAM.

Scott Mitchell appeals the stalking injunction entered against him. The injunction has now expired on its own terms, so it no longer has effect. Nonetheless, we cannot dismiss the appeal as moot because "collateral legal consequences flowing from such an injunction outlast the injunction itself." *Murphy v. Reynolds*, 55 So. 3d 716, 716 (Fla. 1st DCA 2011).

Viewing the evidence in a light most favorable to Appellee, we conclude that the evidence did not support a finding that Mitchell's conduct was sufficient to "cause[] substantial emotional distress" under the reasonable-person standard we must apply. *See* § 784.048(1)(a), Fla. Stat.; *see also Bouters v. State*, 659 So. 2d 235, 238 (Fla. 1995) (holding objective, reasonable-person standard applies). Accordingly, we reverse the order. *See Ashford-Cooper v.*

*Ruff*, 230 So. 3d 1283, 1283 (Fla. 1st DCA 2017) ("[T]here was no evidence that the repeated calls and texts Appellant made to Appellee to try to get in touch with her husband caused Appellee— or would cause a reasonable person in Appellee's position— substantial emotional distress."); *David v. Schack*, 192 So. 3d 625, 628 (Fla. 4th DCA 2016) (reversing stalking injunction after finding reasonable person would not suffer substantial emotional distress when respondent "banged on [petitioner's] door" and left a letter and payment); *Plummer v. Forget*, 164 So. 3d 109, 110 (Fla. 5th DCA 2015) ("Based upon our careful review of the record, we conclude that the incidents described by Forget, when examined through the prism of the 'reasonable person' standard, would not have caused 'substantial emotional distress' to support a finding of stalking."); *Leach v. Kersey*, 162 So. 3d 1104, 1106 (Fla. 2d DCA 2015) (noting that "[a] reasonable woman who had an eighteen-month affair with another woman's husband might well expect to hear the scorn of an angry wife" and concluding that "[t]he evidence fails to show that a reasonable person in Kersey's situation would suffer substantial emotional distress from these contacts"); *Touhey v. Seda*, 133 So. 3d 1203, 1204 (Fla. 2d DCA 2014) (reversing stalking injunction after finding reasonable person would not suffer substantial emotional distress based on particular contacts); *Goudy v. Duquette*, 112 So. 3d 716, 717 (Fla. 2d DCA 2013) ("[A] reasonable person would not have suffered substantial emotional distress as a result of the conversation, however one-sided or hostile it might have been."); *Jones v. Jackson*, 67 So. 3d 1203, 1203-04 (Fla. 2d DCA 2011) (finding appellant's threatening phone calls and text messages to appellee, and his statements to third parties suggesting he would do violence to appellee, would not have caused a reasonable person to suffer substantial emotion distress); *Slack v. Kling*, 959 So. 2d 425, 426 (Fla. 2d DCA 2007) ("Slack left [two] voice message[s] stating that if Kling did not stay away from Slack's wife, Slack would make an 'arrangement.' We conclude that nothing in the record demonstrates any basis for finding that a reasonable person would suffer 'substantial emotional distress' from these two phone messages." (footnote omitted)); *McMath v. Biernacki*, 776 So. 2d 1039, 1040-41 (Fla. 1st DCA 2001) (noting that appellee admitted appellant never threatened her and holding that "[n]o evidence exists in the record that a reasonable person would suffer substantial emotional distress from these incidents. The record

2

reveals that the appellee does not feel comfortable around the appellant. In response to why the appellee was afraid of the appellant, the appellee stated that the appellant did not understand her and had made several attempts to talk to her.").

REVERSED.

B.L. THOMAS, C.J., and WINSOR, J., concur; OSTERHAUS, J., dissents with opinion.

—————————————

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

—————————————

OSTERHAUS, J., dissenting.

I think we should affirm because competent, substantial evidence supports the trial court's conclusion that Mr. Mitchell violated the stalking statute.

—————————————

Seth Schwartz and Albert J. Tasker, The Schwartz Law Group, P.A., Jacksonville, for Appellant.

Taylor Nicole Brogden, pro se, Appellee.

—————————————

**ORDER ON MOTION FOR HEARING EN BANC**

A judge of this Court requested that this cause be heard en banc in accordance with Florida Rule of Appellate Procedure 9.331(c). All judges in regular active service have voted on the request. Less than a majority of those judges voted in favor of

hearing en banc. Accordingly, the request for hearing en banc is denied.

B.L. THOMAS, C.J., and LEWIS, ROBERTS, WETHERELL, ROWE, RAY, OSTERHAUS, KELSEY, WINOKUR, JAY, WINSOR, and M.K. THOMAS, JJ., concur.

WOLF and BILBREY, JJ., dissent.

MAKAR, J., dissents with opinion.

_____

MAKAR, J., dissenting from the denial of hearing en banc.

Due to a large caseload, our fifteen-member appellate court—like the other four district courts in Florida—assigns each case randomly to a three-judge panel for disposition, raising the trivia question: How many different three-judge panels are possible? If you said 455, you're correct.[1] Most people guess a far smaller number. What isn't trivial is the jurisprudential impact that so many different panels have on similar or related cases, making the need for intra-court decisional uniformity important, which was the basis upon which en banc review was sought as to the proposed disposition of this case by a divided panel.[2]

_____

[1] The formula for combinations applied here is (15x14x13)/(1x2x3)=455. When you factor in visiting judges (circuit judges from within our district or judges from other district courts of appeal) the number increases substantially. The Second District, the largest intermediate appellate court in Florida with sixteen members, has 560 possible three-judge panels (slightly less due to a husband-wife combo currently serving on that court); the Third District, the smallest with ten members, has 120 possible three-judge panels. Viewed in a different way, it takes about ten years for a district judge to sit with every possible combination of her colleagues on a fifteen-member court (assuming no panel combinations are repeated, which is unlikely).

[2] Review was sought because it was unlikely that the victim, who had no lawyer at trial or on appeal, would seek review. She

Decisional uniformity is so important that it is one of only two grounds for en banc review, the other involving cases of exceptional importance. Rule 3.331, Fla. R. App. P.  (2018). It is the primary tool for reducing disparate results within a large appellate court arising from randomized panel assignments. For example, in *Jones v. State*, 790 So. 2d 1194, 1196 (Fla. 1st DCA 2001), this Court decided to hear a case en banc "to resolve a conflict in our opinions regarding the applicable standard of review" in a criminal case. By doing so, the Court furthered "a primary function of the en banc rule [which] is to standardize the decisions of each district so as to minimize the importance of the 'luck of the [appellate] draw' . . . in presenting cases before our increasingly multi-member courts." *Schreiber v. Chase Fed. Sav. & Loan Ass'n*, 422 So. 2d 911, 912 n.1 (Fla. 3d DCA 1982) ("*Schreiber I*") (Schwartz, J.), *decision quashed*, 479 So. 2d 90 (Fla. 1985) (adopting Judge Schwartz's viewpoint).

Without en banc review for uniformity, we'd not be one court attempting to dispense uniform justice, but an assemblage of 455 randomly-assigned and autonomous three-judge panels each doing as it sees fit. That is not our jurisprudential system. As our supreme court said when it established the en banc rule: "Under our appellate structural scheme, *each three-judge panel of a district court of appeal should not consider itself an independent court unto itself, with no responsibility to the district court as a whole.*" *See In re Rule 9.331, Determination of Causes by a Dist. Court of Appeal En Banc, Fla. Rules of Appellate Procedure*, 416 So. 2d 1127, 1128 (Fla. 1982) (emphasis added). The court long ago held that language in article V, section 4—that "three judges shall consider each case"—does not "restrict[] the district courts from hearing cases en banc." *Chase Fed. Sav. and Loan Ass'n v. Schreiber*, 479 So. 2d 90, 93 (Fla. 1985) ("*Shreiber II*"). The purpose

---

filed a pro se answer brief (well done by pro se standards), but it was stricken for technical non-compliance with our Court's citation rules, such that only the appellant's brief was considered. It would have been better to have stricken only the non-compliant portions. Better yet, consideration ought to be given to appointing counsel or encouraging legal aid organizations and appellate pro bono attorneys to provide representations in this type of case where one or both parties lack counsel.

of the en banc process is to unify a court's jurisprudence, rather than potentially fracture it by giving decisions of three-judge panels preferred or protected status. As our supreme court said in support of the en banc rule:

> The en banc process now authorized for the district courts is designed to help the district courts avoid conflict, assure harmonious decisions within the courts' geographic boundaries, and develop predictability of the law within their jurisdiction. *Consistency of decisions within each district is essential to the credibility of the district courts.* There has been criticism of intermediate appellate courts for their failure to speak with "a single voice of the law." Meador, *An Appellate Court Dilemma and A Solution Through Subject Matter Organization,* 16 U. Mich. J.L. Ref. 471, 474 (1983). As judges are added to Florida's district courts to meet expanding caseloads, the resulting increased number of three-judge panels cannot help but increase the number of inconsistent and conflicting decisions. When there is a general rotation of Florida's district court judges among three-judge panels, the increased number of panel combinations compounds the problem. With a five-member court, the number of different panel combinations is ten. With a twelve-member court, however, the number of panel combinations is 220. *The en banc process provides a means for Florida's district courts to avoid the perception that each court consists of independent panels speaking with multiple voices with no apparent responsibility to the court as a whole. The process provides an important forum for each court to work as a unified collegial body to achieve the objectives of both finality and uniformity of the law within each court's jurisdiction.*

*Schreiber II,* 479 So. 2d at 93-94 (emphasis added). Uniformity review, perhaps a bit like a cranky hall monitor, helps to keep order by requiring three-judge panels to be open-minded as to the views of their colleagues and responsible to the court as a whole in their decisions, particularly written ones that become binding precedent. Our supreme court—with its limited jurisdiction—does

6

not perform this function; instead, each district court must do so, making enthusiasm and dedication to the task important.

Little judicial fervor exists for decisional uniformity, however. The primary reason is an institutional predisposition—ingrained on the first day of new appellate judges' school—to avoid the en banc process and its rancor entirely, invoking it only as a last resort in extraordinary situations, typically only very high-profile cases. An almost plague-like resistance prevails. Another reason is that en banc review takes time and energy, both of which may be in short supply, making the judicial cost/benefit balance teeter presumptively against review. And a key word in Rule 9.331(a) is that en banc review is appropriate only if "*necessary* to maintain uniformity in the court's decisions." Rule 9.331(a), Fla. R. App. P. (2018) (emphasis added). What may be important to one judge may not matter to others, making the necessity for en banc review in the eye of each judicial beholder.

And what standard should apply in deciding when uniformity review is justified? As noted in *Jones*, the "district courts are free to adopt their own standards for determining whether en banc consideration is required to maintain uniformity of decisions. An intra-district conflict may justify en banc review even if it does not meet the more exacting definition of 'express and direct conflict' in the context of the supreme court's discretionary jurisdiction." 790 So. 2d at 1196 (citing *Schreiber II*, 479 So. 2d 90). Our court lacks a standard for uniformity review, saying only that it is a discretionary decision, Internal Operating Procedures, 6.4. ("A decision to grant or deny en banc review on either of these [two] grounds is within the discretion of the court."), but we ought to have one, as should any large multi-member appellate court.[3] For example, Judge Schwartz proposed that "an appropriate standard or rule-of-thumb is the rather practical one that decisions lack uniformity whenever it appears that they are so inconsistent and

---

[3] We also have no standard for determining what cases are of "exceptional importance" under the en banc rule. *In re Doe 13-A*, 136 So. 3d 748, 754 (Fla. 1st DCA 2014) ("This Court has not expressly articulated standards for determining whether a case is exceptionally important.") (Rowe, J., dissenting from denial of hearing en banc).

disharmonious that they would not have been rendered by the same panel of the court." *Schreiber I*, 422 So. 2d at 912 n.1, (Schwartz, J.), *decision quashed*, 479 So. 2d 90 (Fla. 1985) (adopting Judge Schwartz's viewpoint that uniformity review is not limited to direct conflict). This standard is workable, and others exist, but what matters most is that there exists a standard that reflects commitment to the goal of uniformity. After all, even a uniform standard can be applied in a non-uniform manner, making institutional devotion to decisional uniformity a key factor.

In this regard, an oft-heard comment against uniformity review is: "If I were on the panel, I'd decide the case differently, but it is not en-banc-worthy." By this reasoning, uniformity will never occur; panel decisions become immunized from internal review even if a majority of the court may disagree with them. Uniformity review, of course, cannot be undertaken in every case where a judge disagrees with a panel decision; we don't have the ability to oversee each other's daily work to that degree; indeed, the largest slice of our caseload results in per curiam affirmed decisions, which escape uniformity review *entirely* because no written opinion is produced and non-panel members typically are unaware of the issues raised and the basis for their resolution. In any event, although perfect decisional uniformity is impossible, striving for and encouraging en banc review on this basis is a worthy goal.

Given this backdrop, it is respectfully submitted that a substantial likelihood exists, if not a certainty, that the "luck of the draw" will dictate whether stalking injunctions are upheld or reversed in this district absent clarity in how the appellate standard of review is to be applied in this class of cases—for which uniformity is important. Panels will decide similar cases differently, applying standards of review in differing ways and viewing factual records through divergent minds' eyes. The degree of decisional dispersion is potentially wide, resulting in unpredictable and inconsistent results based on the panel assigned, just like our jurisprudence on other topics for which a motion for hearing en banc failed. *See, e.g.*, *In re Doe 13-A*, 136 So. 3d at 758 (denial of hearing en banc with a concurral, four dissentals, and a commental). I disagree profoundly that a basis for reversal exists in this case, but—more importantly—believe

8

that uniformity review would produce greater clarity and predictability, as in *Jones* and *In re Doe 13-A*, on the appellate standard of review  and its application to the record in this class of cases.