# FIFTH DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

Case No. 5D2024-2334
LT Case No. 2023-CF-009499-A

_____

ANTUAN DEANGELOS WILLIAMS,

    Appellant,

    v.

STATE OF FLORIDA,

    Appellee.

_____

On appeal from the Circuit Court for Duval County.
Lindsay L. Tygart, Judge.

Matthew J. Metz, Public Defender, and Brian Hyer, Assistant Public Defender, Daytona Beach, for Appellant.

James Uthmeier, Attorney General, and Darcy Townsend, Assistant Attorney General, Tallahassee, for Appellee.

November 21, 2025

**EN BANC**

A judge of this court requested that this cause be considered en banc in accordance with Florida Rule Appellate Procedure 9.331(c). All judges in regular active service that have not been recused voted on the request. Less than a majority of judges voted

in favor of hearing en banc. Accordingly, the request for hearing en banc is DENIED.

JAY, C.J., and LAMBERT, EISNAUGLE, BOATWRIGHT, KILBANE, and MACIVER, JJ., concur.

MAKAR, J., dissents with an opinion in which WALLIS, EDWARDS, and HARRIS, JJ., concur.

SOUD, J., recused.

MAKAR, J., dissenting from the denial of hearing en banc.

The prior precedent rule (aka stare decisis) requires that no panel of an appellate court can overturn or circumvent precedent without the full court's approval via an en banc proceeding. Nothing is more deleterious to the stability of the rule of law than avoidance of this rule. What follows explains why the panel in this case should have invoked the en banc process from the outset, when it was its responsibility to do so, rather than subsequently oppose it when members of this Court raised concerns.

I.  *Long-Standing Precedent Authorizes the Correction of Clerical Errors.*

This case involves the long-standing and universally accepted practice in Florida appellate courts of correcting clerical/scrivener's/ministerial errors ("clerical errors") in criminal cases, meaning those arising in the judicial process.[1] This type of slipup is an "error resulting from a minor mistake or inadvertence, especially in writing or copying something on the record, and not from judicial reasoning or determination." *Clerical error*, *Black's Law Dictionary* (8th ed. 2004) ("Among the boundless examples of clerical errors are omitting an appendix from a document; typing an incorrect number; mistranscribing a word; and failing to log a call."). It is well-accepted that a "court can correct a clerical error at any time, even after judgment has been entered." *Id.*[2]

---

[1] Legislative scrivener's errors, such as when courts are asked to rewrite an incorrectly worded statute, are not at issue. *See generally* Michael S. Fried, *A Theory of Scrivener's Error*, 52 Rutgers L. Rev. 589, 594 (2000) (providing examples such as use of "unlawful" for "lawful").

[2] *See, e.g.*, *Aetna Ins. Co. v. Boon*, 95 U.S. 117, 125–26 (1877) ("It is familiar doctrine that courts always have jurisdiction over their records to make them conform to what was actually done at the time" and "every court of record has power to amend its

Clerical errors are correctable on appeal because doing so does not require the appellate court to "adjudicate" anything; it merely points out a clerical error for correction. No core judicial power is wielded; no "judicial reasoning or determination" occurs. Instead, rectifying this type of error merely *corrects what is incontestable* (e.g., the length of a sentence in a criminal case or its conditions), thereby restoring what is unquestionably incorrect on the face of the appellate record. It is perhaps the most modest exercise of judicial guidance imaginable; it has been a corrective mainstay for decades without opposition from anyone, including the State or the defense bar. No court has claimed it must sit on its hands and ignore these types of clerical errors, particularly those that benefit convicted criminals. Until now.

The panel in this case—on its own initiative, without a request from or participation by the parties, and without seeking en banc review—has muddled precedent, thereby creating conflict and uncertainty in the law and reducing public safety. Its holding—that appellate courts lack authority in *Anders*[3] appeals to correct clerical errors *that favor criminal defendants*—runs counter to precedent, prudent judicial practices, and clear legislative intent. This exercise of judicial power—without first seeking the full court's approval—weakens the en banc process.[4]

_____

records, so as to make them conform to and exhibit the truth."); *see Wilkins v. State*, 110 So. 3d 479, 480 (Fla. 4th DCA 2013) ("A clerical mistake in a judgment can be corrected at any time.").

[3] *See Anders v. California*, 386 U.S. 738 (1967). In *Anders* cases, an "appellate court must examine the record to the extent necessary to discover *any errors apparent on the face of the record*," but need not do so with a "fine tooth comb," seeking to discover the "most remote, unlikely error." *State v. Causey*, 503 So. 2d 321, 322 (Fla. 1987) (emphasis added). Clerical errors in criminal judgments and sentences are frequently discovered during this facial review of the record.

[4] The panel made some changes to its initial opinion in response to considerable internal efforts to avoid an en banc proceeding, but those changes did not meaningfully clarify the jurisprudential confusion that has been created.

4

## II.    *En Banc Review is Warranted.*

As a multi-member appellate court, we are responsible for ensuring that we produce and maintain a uniform jurisprudence. Our duty requires that panel decisions conform to the court's precedents, which can only be changed via the en banc process with participation by the full court's twelve members (less recusals). Our caseload is assigned randomly to panels of three judges, resulting in potentially 220 different panel combinations,[5] which makes the need for intra-district decisional uniformity imperative; a lack of uniformity undermines stability, predictability, and even-handed justice.

Panels do not have the final say; the full court does. "Under our appellate structural scheme, each three-judge panel of a district court of appeal *should not consider itself an independent court unto itself*, with no responsibility to the district court as a whole." *In re Rule 9.331, Determination of Causes by a Dist. Ct. of Appeal En Banc,* 416 So. 2d 1127, 1128 (Fla. 1982) (emphasis added). Our supreme court has made clear that the "en banc process provides a means for Florida's district courts to avoid the perception that each court consists of independent panels speaking with multiple voices with no apparent responsibility to the court as a whole." *Chase Fed. Sav. & Loan Ass'n v. Schreiber*, 479 So. 2d 90, 94 (Fla. 1985). Said differently, appellate panels are not freelancers exercising unconstrained judicial power.

Without the en banc process, this Court would be merely an assemblage of 220 randomly assigned panels each "doing as it sees fit." *Mitchell v. Brogden*, 249 So. 3d 781, 784 (Fla. 1st DCA 2018) (Makar, J., dissenting from denial of hearing en banc). That's why our supreme court has stressed the critical nature of en banc review, saying it "provides *an important forum for each court to work as a unified collegial body* to achieve the objectives of both finality and uniformity of the law within each court's jurisdiction." *Schreiber*, 479 So. 2d at 94 (emphasis added). The highlighted language emphasizes that decisional uniformity is immensely

---

[5] The formula to determine the number of possible three-judge panels on a twelve-member court is (12 x 11 x 10)/(1 x 2 x 3) = 220.

important, and not a mere velleity; it also stresses that the en banc process is a collective one, relying on us to work together as a whole to avoid fragmented jurisprudential outcomes by panels.

As the next sections explain, en banc review is warranted in this case for several reasons. First, the panel opinion should have sought en banc review on its own initiative; instead, it contravenes the prior precedent rule, thereby creating intra-district conflict and undermining uniformity. Second, the divergence from precedent is based on mistakenly conflating two distinct and independent concepts—clerical error correction and *Anders* review—making it seem as if they are inextricably interlaced. The panel opinion also creates a new concept ("reverse *Anders*") and a confusing label ("legal error") that muddle established precedent. Third, the panel opinion violates the party presentation principle upon which it claims reliance for its holding. Fourth, the panel opinion ignores legislative intent, creating potential harm to the public. Finally, the panel opinion misconceives the concept of judicial power by stripping away an uncontroversial and long-standing judicial practice.

A. The Prior Precedent Rule.

This *Anders* case is one of hundreds of appeals involving indigent criminal defendants in which this Court is tasked with independently reviewing the appellate record for errors. *See Anders v. California*, 386 U.S. 738, 744 (1967) (requiring appellate counsel seeking to withdraw in a criminal case to file a brief outlining possible grounds for appeal after which the appellate court independently reviews the case and the defendant is allowed to file a *pro se* brief). As our supreme court has instructed, the "appellate court . . . assumes the responsibility of conducting a full and independent review of the record *to discover any arguable issues apparent on the face of the record.*" *See In re Anders Briefs*, 581 So. 2d 149, 151 (Fla. 1991) (emphasis added). Independent review of the appellate record is a mandatory judicial duty under *Anders*; it is not optional.

Under our Court's prior precedents, a panel—faced with the facts of this specific case—would affirm the conviction of defendant Williams and remand the matter to the trial court for correction of

clerical errors discovered on the face of the record. In this case, these errors included the failure to include a mandatory minimum sentence and fine in the judgment. *See, e.g.*, *Torres v. State*, 236 So. 3d 499, 500 (Fla. 5th DCA 2018) (affirming the judgment and sentence and remanding for correction of scrivener's error to require imposition of ten-year minimum mandatory sentence for the crime of possession of a firearm during the commission of a trafficking offense); *Chase v. State*, 230 So. 3d 629, 629 (Fla. 5th DCA 2017) (remanding "to correct a scrivener's error . . . to reflect the imposition of a twenty-five-year minimum mandatory sentence consistent with the court's oral pronouncement"). A short per curiam affirmance with boilerplate language, used for decades, would uphold the judgment but note the overlooked minimum mandatory sentence and fine, both of which are non-discretionary tasks the Legislature has compelled by law. In pointing out the errors, the appellate panel would not reverse the trial court's judicial labor, but instead merely *remand* to correct an obvious clerical error. *See Torres*, 236 So. 3d at 500 ("AFFIRMED; REMANDED for correction of scrivener's error.").

The problem is that the panel did not request en banc review at the outset, even though this Court recently had *twice* held en banc votes on essentially the identical issues in this case—*Flowers v. State*, 395 So. 3d 1077 (Fla. 5th DCA 2024) and *Youngblood v. State*, 410 So. 3d 598 (Fla. 5th DCA 2024). Each failed by tied votes after motions for en banc, seeking a change in precedent, were properly sought.

In *Flowers*, the panel—under the auspices of *Anders* review—affirmed the judgment and sentence imposed for the armed robberies and murder that Flowers committed. 395 So. 3d at 1077. It was discovered that the sentencing order had an obvious clerical error, specifically that a legislatively mandated minimum sentence of ten-years had not been imposed on the murder count as required by the judge's oral statements at sentencing. *Id.* The panel majority remanded for correction of the clerical error over a dissenting opinion that claimed appellate courts lack "authority to sua sponte take up the sentencing error at issue and remand for a corrected sentence." *Id.* at 1078 (Eisnaugle, J., concurring in part, dissenting in part). The dissent mistakenly claimed that the majority "create[d] a new type of reverse *Anders* review," *id.,* when,

7

in fact, this ministerial correction of clerical errors has been done for decades. In effect, the dissent erroneously conflated *Anders* review with the timeworn practice of correcting clerical errors. A judge's subsequent en banc motion—seeking to change the law—failed by a vote of six to six, which resulted in adherence to precedent.

Soon thereafter, the panel in *Youngblo*od affirmed the convictions and sentences of Youngblood under *Anders* review; it also reversed the imposition of costs not orally pronounced at sentencing. 410 So. 3d at 598. As in *Flowers*, it was discovered that numerous clerical errors existed in the written judgment, including that the "defendant shall be required to submit DNA samples *as required by law*." *Youngblood*, 410 So. 3d at 598 (emphasis added). In addition, ministerial correction of the scoresheet, the concurrency of Youngblood's sentences, and corrections for time served were identified in remanding the case to the trial court. *Id.* The dissent disagreed with correction of the clerical errors, citing the dissent in *Flowers*. *Id.* at 599.

Like *Flowers*, the en banc vote in *Youngblood* failed by a vote of 6-6, which was accompanied by a dissental that explicitly conceded that "[o]ur court and other district courts have, from time to time, corrected these types of errors in *Anders* cases." *Youngblood v. State*, 410 So. 3d 692 (Fla. 5th DCA 2025) (Eisnaugle, J., dissenting on denial of rehearing en banc). In other words, the dissental recognized that precedent existed and authorized what the majority had done but argued nonetheless that precedent should not be followed. Despite precedent on point, the dissental questioned whether authority existed to "correct these types of errors, and if so, whether correction is mandatory or discretionary." *Id.* at 693. The dissental concluded by saying these issues are of "exceptional importance" and that this Court "should decide [them] en banc." *Id.* Notably, the dissental again did not recognize that *Anders* review and the correction of clerical errors are independent sources of appellate authority to review the record on appeal, the latter allowing for correction of clerical errors discovered in any case, not just *Anders* cases.

Despite these recent en banc motions, the panel in this case chose not to seek en banc review and, on its own, took on the

"issues of great importance" that the dissental in *Youngblood* had just said "should be decide[d] . . . en banc." In doing so, the panel opinion explicitly acknowledges that binding precedent exists. It concedes that "[t]his court and other district courts have, for some time now, used *Anders* cases to correct scrivener's errors that harm the government." *Williams v. State*, 50 Fla. L. Weekly D1636d, No. 5D2024-2334, 2025 WL 2092230, at *1 (Fla. 5th DCA July 25, 2025). It cites numerous precedents, ones that panels must follow, including *Flowers* and *Youngblood*. It even *concedes* that *Flowers* involves the identical "substantive error" at issue in this case. *Id.* at *2 ("To be clear, both this case and *Flowers* involve the *exact same substantive error*—a failure to impose the minimum mandatory sentence as required by law." (emphasis added)). It was obvious that en banc review was warranted.

"Same facts + same issue = different outcome" is a recipe for decisional conflict, as the contrary holdings in *Flowers, Youngblood*, and this case now confirm. En banc review exists to ensure uniformity and reduce the serendipity of divergent outcomes from random appellate panel assignments. *See McAllister v. McAllister*, 345 So. 2d 352, 354 (Fla. 4th DCA 1977). A "primary function of the en banc rule is to standardize the decisions of each district so as to minimize the importance of the 'luck of the [appellate] draw' . . . in presenting cases before our increasingly multi-member courts." *Schreiber v. Chase Fed. Sav. & Loan Ass'n*, 422 So. 2d 911, 912 n.1 (Fla. 3d DCA 1982) ("*Schreiber I*"), *quashed by*, 479 So. 2d 90 (Fla. 1985) (adopting the viewpoint of Judge Schwartz, the authoring judge of *Schreiber I*). As the Third District held in *Schreiber I*, an "appropriate standard or rule-of-thumb" to apply "is the rather practical one that decisions lack uniformity whenever it appears that they are so inconsistent and disharmonious that they would not have been rendered by the same panel of the court." 422 So. 2d at 912 n.1. That standard is easily met here, as reflected in the direct conflict between this panel decision and cases such as *Flowers* and *Youngblood*.

The panel opinion claims that binding precedent, such as *Flowers*, need not apply. Why? Because it views the error in *Flowers* as a "scrivener's error," but claims that the same error in this case was a "legal" error. *Id.* ("The only difference between this

case and *Flowers* is that, in this case, the error is legal in nature (the result of a judicial error) while the error in *Flowers* arose as a scrivener's error."). No meaningful explanation of the difference between the "scrivener's error" in *Flowers* and the so-called "legal" error in this case is provided. Instead, the panel opinion *concedes* that the "substance of each error is the same" in both *Flowers* and this case. *Id.* By ipse dixit, however, a clerical error that is remediable under applicable precedent, *Flowers*, is transformed into an uncorrectable "legal" error. *Ipse dixit, Black's Law Dictionary* (8th ed. 2004) ("Something asserted but not proved.").

Judicial redefinition of this kind has an Alice in Wonderland air about it. *See Lopez v. Gonzales*, 549 U.S. 47, 54 (2006) (quoting Lewis Carroll's *Alice in Wonderland* for "Humpty Dumpty us[ing] a word to mean "'just what [he chose] it to mean—neither more nor less"'"); *United States v. Winstar Corp.*, 518 U.S. 839, 928–29 (1996) (Rehnquist, CJ, dissenting) ("Such a result has an Alice in Wonderland aspect to it, which suggests the distinction upon which it is based is a fallacious one."). Relabeling the failure to impose a legislatively mandated sentence or fine as an uncorrectable "legal" error, rather than a correctable clerical one, is a distinction with no practical difference.

Keep in mind that the type of clerical errors in this case involve *legislatively mandated* costs/fees or *minimum mandatory* sentences/fines. District courts statewide uniformly correct judgments and sentences that failed to impose these *legally* mandatory conditions. If a judge fails to check the box on a minimum mandatory sentence, fails to impose mandatory costs/fees, or fails to check the box or impose a minimum mandatory fine, precedent allows for correction. The panel opinion's holding, that it lacks judicial power to act, is supported by *no precedent whatsoever*; indeed, it conflicts with relevant precedent as to mandatory costs/fees, mandatory minimum sentences, and mandatory minimum fines. *See, e.g.*, *Schramm v. State*, 414 So. 2d 295, 295 (Fla. 2d DCA 1982) (remanding "to the trial court for correction of the apparent clerical error in the order of judgment and sentence. Appellant is to be resentenced, in accordance with section 893.135, Florida Statutes (1979), to the minimum mandatory fine of $100,000.00."). Explaining itself, the panel opinion says that the "mere existence of error, without more,

is not enough to justify the exercise of judicial power," but that ignores the decades of precedent, including *Anders* and *Causey*, empowering appellate courts to correct these *specific* types of errors. As such, the panel opinion is an outlier, best "limited to the present circumstances." *See Bush v. Gore,* 531 U.S. 98, 109 (2000).

In summary, the panel opinion acknowledges precedent but makes a meaningless distinction between "legal" errors and clerical errors. In the panel opinion's view, the former are off limits and uncorrectable despite the error being identical substantively to the latter, which are correctable under long-standing precedent. Legal principle and uniformity—not creative nomenclature—should govern our precedent.

B. Conflating *Anders* Review and Clerical Error Correction.

The panel opinion conflates clerical error correction and *Anders* review, concluding that the latter does not permit correction of clerical errors that benefit criminal defendants. In doing so, it creates the misimpression that the former, *Anders* review, automatically precludes the latter, clerical error correction. It does not.

When Florida appellate courts review the face of the record in a criminal case, they occasionally discover an apparent clerical error in a defendant's judgment or sentence. Errors of this type occur in *Anders* cases and non-*Anders* cases and can "benefit" either party, meaning the error—if left uncorrected—gives an unjustified windfall to one party or the other. Correction of clerical errors is universally acknowledged as an important judicial function. *See Drumwright v. State*, 572 So. 2d 1029, 1031 (Fla. 5th DCA 1991) ("Florida has long recognized a court's inherent power to correct clerical errors."); *see also Palmer v. State*, 300 So. 3d 1247, 1248 (Fla. 5th DCA 2020) (same). Clerical errors can have ripple effects, foreseen and unforeseen. They can potentially affect not only the sentences themselves but also future collateral proceedings, such as violation of probation or postconviction proceedings, as well as potential habitualization consequences. *See Carter v. State*, 786 So. 2d 1173, 1180 n.6 (Fla. 2001) (stating that "improper habitualization may have collateral consequences that could ultimately increase the length of [a defendant's] sentence").

11

Correction of clerical errors may also impact applications for clemency or commutations of sentences. *See Palmer*, 300 So. 3d at 1247 (noting Palmer "further argues that the judgment, which will be submitted as part of his application, should accurately reflect the nature of his conviction. We find merit to Palmer's argument.").[6]

As the panel opinion concedes, Florida appellate courts have been identifying clerical errors for decades, not because they are "reversible" errors under *Anders*, but because they are independently correctable errors, rectified to avoid potential future problems. Correction of clerical errors—a de minimis power—has been done routinely in Florida. Rather than bore the reader with lengthy string citations, a simple Westlaw query in the Florida cases database such as, "remand /s (error /s (clerical scrivener ministerial))," returns 867 cases alone from 1985 to the present, demonstrating the extent of this means of error correction.

The gist of the panel's holding is a newly invented legal principle: clerical errors in a judgment or sentence *that favor a criminal defendant* must be ignored in an *Anders* appeal. The panel cites no precedent for its novel judicial creation; its apparent reasoning is that because *Anders* review is primarily done to benefit indigent criminal defendants, an appellate court must ignore obvious clerical errors that inured to criminal defendants'

---

[6] *See also Goff v. State*, 294 So. 3d 1016, 1016 (Fla. 5th DCA 2020) (affirming judgment and sentence and remanding with directions for the trial court to correct a written order that inadvertently revoked defendant's probation instead of her community control); *Simmons v. State*, 286 So. 3d 877, 878 (Fla. 5th DCA 2019) (affirming and remanding with directions for the trial court to correct the sentence, which showed one of defendant's counts to run consecutively when oral pronouncement required that it run concurrently); *Issac v. State*, 662 So. 2d 399, 399–400 (Fla. 5th DCA 1995) (affirming and remanding for trial court to correct the written judgment, which mistakenly listed the defendant's conviction as a second-degree felony when it was a first-degree felony); *see generally* M.L.C., Annotation, *Correcting clerical errors in judgments*, 126 A.L.R. 956 (1940).

benefit.[7] No state or federal court in the history of *Anders* jurisprudence has said such a thing. Clerical error correction is an independent and de minimis judicial power of ancient origin that existed long before the *Anders* decision was issued in 1967. Nothing in *Anders,* nor in the 108,332 cases citing *Anders* since 1967, has ever held that courts must ignore clerical errors that favor criminal defendants and leave them uncorrected.

The premise of the panel opinion—that correction of clerical errors benefiting criminal defendants must be ignored—is misguided. *It is the clerical error itself that unjustifiably benefitted a party*; *correction of the error simply restores the judicial record's accuracy and makes it speak the truth. See D'Alessandro v. Tippins*, 124 So. 455, 456 (Fla. 1929) ("If the first sentence [of the judgment] contained clerical or formal errors, the judgment as entered may at any time be corrected so as to speak the truth of what was in fact done by the court."). In a word, it is repristination, meaning to restore to an original state or condition. *Repristinate*, *The New Shorter Oxford English Dictionary* (Thumb Index ed. 1993). Restoration of justice in a criminal case is a good thing, not something to be disregarded. Nothing in *Anders* or its history suggests that clerical errors that benefitted criminal defendants should be ignored, making the panel's holding uniquely out of sync with nationwide precedent.

---

[7] In a related context, the First District rejected the argument that "the oral-pronouncement-controls rule applies only when it benefits the defendant." *Spatcher v. State*, 228 So. 3d 1162, 1164 (Fla. 1st DCA 2017). Doing so would be "tantamount to arguing that the lesser punishment always controls, a rule we have never recognized." *Id.* Instead, the "rule that oral pronouncements control operates whether it helps or hurts a defendant." *Id.* Likewise, correction of clerical errors is permissible whether it helps or hurts a defendant.

C. Violation of Party Presentation Principle.

Next, appellate courts should generally "stay in their lane" and not become counsel for a party by raising unbriefed and unpreserved issues. That's the central premise of the party presentation principle, which:

> says an appellate court should generally decide only those legal issues presented to it by the parties. *See Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring) ("Our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief."); *see also Berben v. State*, 268 So. 3d 235, 239 (Fla. 5th DCA 2019) (Grosshans, J., dissenting) ("As an appellate court, our role is not to act as counsel for a party by raising issues that were not briefed."); *see generally United States v. Sineneng-Smith*, 590 U.S. 371, 379–80 (2020) (discussing party presentation principles and holding unanimously that the Ninth Circuit's failure to address the party-presented controversy and, instead, "takeover" of the appeal by raising new issues, amounted to an abuse of discretion).

*Crist v. State*, 50 Fla. L. Weekly D1833d, No. 5D2022-2966, 2025 WL 2371385, at *28 (Fla. 5th DCA Aug. 15, 2025) (Makar, J., concurring in part, dissenting in part).[8]

In this case, the panel opinion does not abide by the party presentation principle, which is ironic twofold. The first irony is

---

[8] As mentioned in *Crist*, the trend in this District is to slacken the party presentation principle, giving extra judicial powers to panels and the Court as a whole to reshape cases. *Crist v. State*, 50 Fla. L. Weekly D1833d, No. 5D2022-2966, 2025 WL 2371385, at *29 (Makar, J., concurring in part, dissenting in part) ("[W]e judges can raise and adjudicate issues the parties did not raise. . . . We can blaze our own judicial path and decide unpreserved legal issues with novel jurisprudential approaches that are advanced for the first time on appeal by the Court itself.").

that, *on its own, the panel raises and adjudicates issues that no party has raised*; nor have the parties been given an opportunity to present legal argument or participate in the panel's decision, which raises serious judicial process concerns. The panel opinion says that the "party presentation principle ensures that Florida's courts remain at rest . . . *until properly presented with an issue for decision.*" *Williams*, 2025 WL 2092230, at *4 (emphasis added). Yet the issue it decides was not "properly presented" to the panel for decision; quite the opposite, the panel *presented itself* with the issue and left the parties out of the process. It even concedes that "no party has raised the issue of the minimum mandatory sentence or mandatory fine on appeal," but nonetheless decides it on its own. *Id.* at *5. Even the State of Florida, a party to the case, and the Attorney General, were left in the dark.

The second irony is that the panel opinion relies on the party presentation principle as the centerpiece of its reasoning to overturn precedent. How can a panel opinion not follow the central premise of its own opinion yet expect its reasoning to be viewed without skepticism? Practicing the proverbial saying "Do as I say, not as I do" does not build confidence. Plus, if a panel raises and decides on its own that the United States Supreme Court's decision in *Anders* limits its judicial powers (a major jurisprudential leap), why can't panels do something far more restrained and modest by exercising minimalist judicial powers to correct obvious, though unraised, clerical errors that favor convicted criminals (i.e., following precedent)? Something's wrong with this picture.

Finally, this Court recently denied en banc review twice on the same issue. The closeness of the prior en banc votes, at a minimum, warranted that the panel seek en banc review so that the full court could have attempted to achieve a jurisprudential equilibrium from the outset versus having ongoing range wars in concurring and dissenting opinions down the road; not to mention the conflicting dispositions that are certain to occur. We shouldn't be playing an intra-mural game of leapfrog, each panel deciding for itself which jurisprudential lily pad it wants to land upon.

15

D. Correction of Minimum Mandatory Sentences and Fines Fulfills Legislative Intent.

Judicially creating a new legal principle—i.e., that clerical errors in *Anders* cases, no matter how serious, cannot be rectified if the original error *benefitted the criminal defendant*—is misguided. For example, if an appellate panel sees that a violent criminal defendant was sentenced to thirty years in prison, but the sentencing order says thirty months, the panel must ignore it under this new legal construct. Perhaps the State missed the clerical error, but must this Court put on blinders, akin to the famous trial scene in *Planet of the Apes*, where judges turn a blind eye to the obvious?[9]

Doing so disregards the Legislature's will. Ignoring clerical errors of this type serves no public purpose and, indeed, could have adverse public safety ramifications. The thirty years/thirty months example is not a hypothetical; *it actually happened in this District.* In *Drumwright*, the defendant was sentenced as a habitual offender with "a sentence of 30 *years.* Through a clerical error the judgment reflected a sentence of 30 *months* without the designation of habitual offender." 572 So. 2d at 1030. The defendant "went off to prison" but must have recognized his good fortune because he "dismissed his appeal and was released less than 6 months later credited with serving his 30 month sentence." *Id.* Someone in the community apparently saw him and contacted the trial court, which "reviewed the file, discovered the clerical error and corrected the judgment" to reaffirm the original thirty-year sentence, which this Court affirmed. *Id.* But what if the defendant had continued his appeal and the serious clerical error was first discovered by this Court? Should it sit on its hands and not point it out? Hope that the defendant will be foolish enough to go back to his community and be seen, as this one did? I think not.

---

[9] *See Three wise monkeys*, Wikipedia (Oct. 3, 2025, at 21:58 UTC), https://en.wikipedia.org/wiki/Three_wise_monkeys (discussing trial scene from *Planet of the Apes*); *see also* James Anderson, *Planet of the Apes: See No Evil, Hear No Evil, Speak No Evil,* at 0:17–0:25 (YouTube, February 8, 2017), https://www.youtube.com/watch?v=0xJz9dLyRI8.

Another example from our Court is a case where a judge stumbled upon a sentencing error by happenstance. In *Mims v. State*, Mims was sentenced to four years imprisonment for armed robbery offenses (with a minimum mandatory of three years) and probation to follow on a firearm charge. 569 So. 2d 864, 864–65 (Fla. 5th DCA 1990). For unknown reasons, Mims was released before serving three years in prison, possibly as early as one year into his sentence. *Id*. at 865. He got arrested again and, while back in jail, he moved to vacate his firearm charge related to the armed robbery charges on double jeopardy grounds; his motion was heard by the original sentencing judge. *Id*.

> While successful in that endeavor, [Mims] gave the trial court the opportunity to discover, to its surprise, that [Mims] had been let out of prison before serving his minimum sentence. The judge had no way of knowing at that point how much of the sentence Mims had served or whether the Department of Corrections might have had some legitimate reason for releasing him early, but there was reason to suspect that Mims had gained his freedom because of a mistake.

*Id*. The trial judge entered a nunc pro tunc order, correcting Mims's sentence, which this Court characterized as "carrying out something akin to correction of a scrivener's error." *Id.* Query again, what if a clerical error of this type was first discovered on appeal by this Court? Do nothing, or do something to correct the error on the face of the record? The answer is obvious.

The Legislature will likely not look with favor on courts that turn a blind-eye by failing to correct the imposition of minimum mandatory *fines* but correct mandatory *costs/fees* (which is done statewide). Legislators would surely see it as contrary to their clear and unambiguous statutory language. They would justifiably not see the difference between correcting clerical errors involving minimum prosecution and defense costs/fees and correcting minimum mandatory fines. In either case, these incontestable clerical errors should be corrected so that legislatively mandated financial obligations are imposed on criminal defendants. What's wrong with that? Doing so simply corrects what would otherwise be a departure from what the Legislature clearly intended; if the

17

Legislature wanted costs/fees and fines to be discretionary, it could have said so, but it has not—they are legislatively mandated.

Moreover, correction of such errors neither benefits the State nor harms criminal defendants; correction merely achieves the *just result* of mandatory financial burdens in the form of fines being placed on criminal defendants that the Legislature commanded. Imagine a legislator trying to explain to a crime victim why a minimum mandatory fine was not imposed against the perpetrator in her case when this Court has allowed for the correction of a 30 year/month sentencing error years after a criminal convict's release, *Drumwright*, 572 So. 2d at 1031 ("Florida has long recognized a court's inherent power to correct clerical errors."), and routinely corrects costs/fees errors. It's hard to imagine any legislator supporting an appellate court sitting on its hands in either situation.[10]

E. An Observation on Judicial Power.

Finally, the panel opinion claims to be restraining judicial power. Yet it employs judicial powers beyond those that panels ought to wield by not seeking en banc review at the outset and deciding issues no party presented. In doing both, it violates principles of judicial restraint, effectively bowling a jurisprudential gutter ball.

In this regard, United States Supreme Court Justice Ruth Bader Ginsburg and Florida Supreme Court Justice Charles

---

[10] To restore the precedential status quo, the Legislature may wish to consider adopting a statute that requires an appellate court to correct clerical errors in minimum mandatory sentences and fines and mandatory costs and fees that are discovered during the appellate review process of every criminal case without regard to whether the criminal defendant is indigent. For example, a statute could provide that: "Trial and appellate courts shall correct or require the correction of clerical errors discovered on the face of a criminal case record involving any mandatory costs or fees and any mandatory sentences or fines (including minimum mandatory sentences and fines) that are required under Florida law."

Canady agreed on one thing: courts lack the power to "reach out and grab cases" they want to rule upon and, instead, must passively "wait for cases" to come to them. *United States v. Sineneng-Smith*, 590 U.S. 371, 376 (2020); *Pino v. Bank of New York*, 76 So. 3d 927, 931 (Fla. 2011) (Canady, C.J., dissenting). Neither would be up in arms that this case was filed in this Court, nor would the Founders. No one on this Court reached out to the parties or the public to yank this case off a nearby street-corner; no judge was sallying about "looking for wrongs to right" in an *unfiled* case. *U.S. v. Samuels*, 808 F.2d 1298, 1301 (8th Cir. 1987) (Arnold, J., concurring in the denial of rehearing en banc). No one on this Court sifts through "its entire docket in search of any and every unraised issue that the court itself wishes to consider." *Williams*, 2025 WL 2092230, at *6. To the contrary, this case arrived in the usual way: via a direct appeal by a criminal defendant. It is a routine matter, one of hundreds like it, assigned to a panel for appellate disposition. The Court took "no active resolution whatever" in exercising judicial power—the case simply lodged itself here on its own. The Federalist No. 78, at 504 (Alexander Hamilton) (Modern Library of New York, 1937).

Judicial power was subsequently used, however, to decide it based on an issue no party raised. Courts have neither executive force nor legislative will, but they do exercise judgment, including when to seek en banc review. By not seeking en banc review initially, the panel opinion, by its own terms, has exceeded the powers it claims should be kept in check. We should, as a full court, be deciding this case—as the dissental in *Youngblood* insisted we should. Judges may have differing views, allowing caselaw to evolve or change, but it must be done via established process in deference to precedent. Even where judges experience wisdom later in their careers, as Justice Scalia made clear, the "demands of stare decisis" must still prevail. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* xxx (2012). As he famously said: "Stare decisis has been a part of our law from time immemorial, *and we must bow to it.*" *Id.* at 414 (emphasis added).

Consistent with Justice Scalia's admonition, appellate judges should not have to "play defense" to protect precedent by seeking en banc review when a panel strays. To the contrary, a panel is

19

obliged to follow precedent; it shoulders the burden of seeking en banc review if it wants to change or modify the law. A district court may choose to exercise the most potent of judicial powers, that being to change existing law, but it must be via the en banc process. Doing so respects authority and the collegial procedure that our supreme court has said is necessary to maintain the goals of finality and uniformity in the law. *See Schreiber*, 479 So. 2d at 94 (finding en banc review provides "*an important forum for each court to work as a unified collegial body*" (emphasis added)). In the end, the integrity of en banc process suffers when it is not followed.

Finally, the full court did not vote en banc to change precedent, which is required to do so, leaving the state of the law in question. Unlike other jurisdictions, where a panel opinion that departs from precedent may become precedential without an affirmative en banc vote of all judges,[11] the vote in this case cannot be said to have accomplished that result. It merely allowed a panel opinion to be released because the votes for hearing en banc were not met. If the panel had sought en banc review and the full court had blessed its opinion, the outcome would be clear, and new precedent would be established; that's how it is supposed to work but didn't in this case. Instead, we now have conflicting intra-district precedent and a muddled jurisprudence that will continue to be problematic until the full court acts to clarify this area of the law or our supreme court weighs in.[12]

\* \* \*

---

[11] *See, e.g.,* Jon W. Newman & Marin K. Levy, *Written and Unwritten: The Rules, Internal Procedures, and Customs of the United States Courts of Appeal* 112–15 (2024) (section entitled Rejecting a Precedential Decision without a Rehearing En Banc).

[12] An alternative, one this author has sought for many years, is an internal committee to prepare a report and recommendations for handling *Anders* cases and clerical errors; legitimate questions exist as to the scope of both types of review that could be collegially addressed. We ought to first undertake this work ourselves and not simply do a third down punt to a bar committee, which has other matters on its plate and would benefit from our collective input.

Rather than exercise judicial restraint, the panel opinion—without the parties' participation or first seeking en banc review—holds that clerical errors that favor criminals must be ignored, thereby disregarding legislative intent and public safety. Earlier this year, it was stressed how indispensable it was for this Court to pursue en banc review on the issue of "exceptional importance" presented in this case, *Flowers*, and *Youngblood*. That was then, this is now. En banc review was necessary—until it wasn't. Clerical error correction involves the most minimal and benign of judicial powers; it takes little time, shows we are on the ball, and avoids potentially harmful consequences. For over a century, federal and Florida courts have had the authority to correct judgments at any time "so as to speak the truth"—no good reason exists to change course now in contravention of the Legislature's will that criminal defendants receive mandatory sentences and fines, particularly without the full court's blessing.

WALLIS, EDWARDS, and HARRIS, JJ., concur.